ADDIE L. WOOD, administratrix, *vs.* INHABITANTS OF
WESTPORT.

Bristol.     January 11, 1904. — May 19, 1904.

Present: KNOWLTON, C. J., LATHROP, BARKER, HAMMOND, & BRALEY, JJ.

*Way*, Defect in highway.   *Negligence*, Contributory.   *Practice, Civil,* Exceptions.

In an action against a town for the conscious suffering and death of the plaintiff's
intestate caused by an alleged defect in a highway of the defendant, consisting
in the want of a barrier on the top of a wall level with the highway but beyond
it, over which the plaintiff's intestate drove on a very dark night, incurring inju-
ries which resulted in his death, it appeared that the intestate was thoroughly
familiar with the place of the accident, and the only direct evidence relating to
due care on his part was that when asked after the accident whether his horse
was getting away from him he said "No, I was driving easy but it was darker
than hell." It further appeared, that the intestate on the day of the accident,
which was in winter, returned from driving at half past seven in the evening and
almost immediately started out again in the dark after trying in vain to get his
horse into the stable, whipping his horse and swearing, and two witnesses who
saw him at that time testified that he seemed to be under the influence of liquor.
*Held*, that there was no evidence to submit to the jury of due care on the part
of the plaintiff's intestate.

In an action against a town for the conscious suffering and death of the plaintiff's
intestate alleged to have been caused by a defect in a highway, consisting of the
absence of a barrier on the top of a wall on the level of the highway but beyond
it, over which the plaintiff's intestate drove in the dark, whether a witness for
the defendant should be allowed to testify, that he was driving along the highway
in question some time before the accident, that it was very dark and that "a
team went by just like a shot", is within the discretion of the presiding judge,
depending upon the question of fact whether the other circumstances of the case
make this circumstance of any significance on the issue of the due care of the
plaintiff's intestate.

TORT, for the conscious suffering and death of the plaintiff's
intestate, alleged to have been caused by a defect in a highway
of the defendant consisting in the want of a barrier on the top of
a wall level with the highway but beyond it, over which the
plaintiff's intestate drove in the dark on the evening of Sunday,
January 26, 1902.  Writ dated March 21, 1902.

At the trial in the Superior Court *Fox*, J. at the close of the
evidence ordered a verdict for the defendant; and the plaintiff
alleged exceptions.

*C. R. Cummings,* (*J. W. Cummings* with him,) for the plaintiff.
*A. J. Jennings & M. Morton, Jr.,* for the defendant.

KNOWLTON, C. J.    This is an action to recover for an injury received by the plaintiff's intestate upon a public highway in the defendant town.   The first count is founded on his conscious suffering after the injury, before his death ; and the second is for his death.    A verdict was ordered for the defendant and the plaintiff excepted.

The place of the accident was near a certain building belonging to the Westport Manufacturing Company, called Mill Number Two, and sometimes the Star Mill, and sometimes the Forge Mill.    The Forge Road, so called, runs past this mill in a direction nearly north and south, on the easterly side of it.    The mill is about two hundred and twenty feet long and forty feet wide, running north and south.    The road is laid out forty feet wide, and is macadamized through the travelled part sixteen feet wide.    Just before the road reaches the mill, going south, is a bridge over the stream, and just to the east of the bridge the water falls over a dam and runs under the bridge in an easterly direction.    In front of the mill the macadamized road, coming southward from the bridge, curves slightly to the left, so that at the south end of the mill it runs a little to the east of south.    The mill is set back to the west of the road, so that there is a distance of thirty-five feet between it and the nearest part of the macadam at the northerly end of the mill, and a distance of thirty-three feet, as given by the maker of the plan and the defendant's witnesses, at the south end of the mill, and of twenty-three feet at that point, as estimated by the plaintiff's witnesses.    From the southerly front corner of the mill is a bank wall extending to the east twenty feet, towards the macadam, and from that point another wall running a little to the southeast, eleven feet, not quite parallel to the line of the road, and from this last point another wall running south fifty or sixty feet, with a railing upon it constructed by the town.    There is no railing upon the first two walls, and the land in front of the mill north of the wall is on a level with the top of the wall. The land southerly and westerly of this wall is much lower, the depth being eleven feet from the top of the wall at the corner of the mill, and five feet at the easterly end of the wall.    This low land to the south and west was covered by scrub trees and bushes, and was referred to as the ditch or swamp.

The accident happened on Sunday, January 26, 1902, on a very dark and somewhat rainy evening.   About a quarter after nine o'clock on that evening, some persons, walking on the road a short distance south of the mill, heard a noise in the bushes below, which on investigation proved to be made by the horse and wagon of the defendant's intestate.   The intestate was found lying, seriously injured, about seven feet from the wall which is along the road, and seven to eight feet from the wall which is at right angles to the road.   The horse and wagon were further along in a southwest direction.   There were wheel tracks south of the wall which runs from the mill to the street, beginning at about seven feet from the corner where the walls come together, and there was a space of about seven feet south-erly of the first mentioned wall where there were no wheel tracks.   No wheel tracks were discovered above the wall.

The theory of the plaintiff is that her husband, while driving southerly along the road, by reason of the darkness passed out of the travelled part of the way and drove over the wall which leads from the corner of the mill towards the road.   The two walls on which there is no railing were built by the manufacturing company, and except for the macadam, which was laid two or three years before the accident, the premises have been in the same condition nearly thirty years.   The plaintiff's intestate had been employed by the manufacturing company many years, working some of the time as a teamster about the Forge Mill and their other mills.   He lived about a mile from the place of the accident, and was thoroughly familiar with the situation. There was no testimony as to how the accident happened, and this can only be inferred from the conditions subsequently discovered.

We will not consider the question whether there was negligence on the part of the defendant in the mode of constructing the road, for we are of opinion that there was no evidence of care on the part of the plaintiff's intestate.   The plaintiff testified on cross-examination, " that on the Sunday of his accident, her husband first went driving about three o'clock in the afternoon and took her little boy with him ; that he returned about half past seven ; that he was not under the influence of liquor ; that he came to the house and wanted her to go out with him ;

that it was then dark; that he drove for her to come and she didn't go; that she did not wish to go and that her husband took the horse out of the wagon and it didn't want to go into the barn and her husband said he guessed he would give it another little drive and perhaps it would go in then; that he tried to persuade it to go in and it would not go; that her husband whipped the horse to try to make him go into the barn and she went out and tried to stop her husband; that she told her husband to hitch the horse outside and let it stand; but didn't remember what he replied; that she didn't think she asked him to stop whipping the horse; that there were two persons present who were as near as she was to the horse; that one of them tried to get the horse into the barn and her husband told him to go to hell; that she didn't know what else took place; that she came away then; that she didn't hear her husband say he would kill the horse or the horse would kill him; that after the man tried to get the horse to go into the barn, and her husband had told him to go to hell, she didn't know what happened; that she didn't stay out; that she went into the house and didn't come out again; that her husband drove up to the door and asked her to go to ride; that she didn't go and she didn't see or hear more after she went in; that she didn't say to her husband that he was too drunk; that her husband had not been drinking; that it was about eight o'clock; that she told him, her husband, that she guessed she wouldn't go to ride but gave no reason for not going; that the horse was then acting all right; that when her husband was whipping it, the horse did nothing bad, he kind of danced around a little but wouldn't go into the stable and didn't go into the stable until they brought him back; that it was the stable he was usually kept in." Four other witnesses, two of whom were present on the occasion of which the plaintiff testified, and another of whom rode with the defendant's intestate a while on Sunday afternoon, gave testimony which tended to show that he was under the influence of intoxicating liquor, and three of them testified directly that they noticed signs of his having been drinking. These were the only witnesses who testified to having seen him that Sunday afternoon or evening.

Two declarations of the plaintiff's intestate were in evidence.

One witness said, " I asked him if the horse was getting away from him and he says, ' No, I was driving easy but it was darker than hell.' " Another testified, " that he went into Mr. Wood's room and asked how it happened and Mr. Wood said that he had got dumped into the ditch down at the forge." It appeared that the mill was generally called the forge.

Except the single expression of the plaintiff's intestate first quoted, there is nothing but conjecture to guide us on the question whether he was exercising any care. That expression has no reference to the subject on which particular care was necessary. Taken in connection with the question to which it was an answer, it simply indicated that the horse was not running away, and that he was not going very fast. The testimony in regard to the darkness of the evening was undisputed, and this fact called for special care in driving, to avoid going out of the road. No prudent person, under such conditions, would think of driving otherwise than very slowly, taking all possible precautions to keep from getting off the travelled road. But the fact that the tracks of the wheels nearest to the wall were seven or eight feet south of it indicates that he went over pretty rapidly. The deceased knew that if he swerved to the right in passing the mill he would drive into the mill yard, and, if he kept on, would drive over the wall. If he was attentive he could not fail to know when he was passing the mill, for the sound of the wooden bridge in passing over it and the sound of the water falling over the dam would tell him that he was within a few feet of the mill. If he could not see where he was going he was bound to use care proportional to the danger. But there is nothing to show that he used any care.

If we resort to probabilities, his conduct that afternoon and evening does not indicate that he was acting prudently. His wife testified that on this winter day he went out driving at about three o'clock, taking his little boy with him, and did not return until about half past seven, and that he then almost immediately went out again on this very dark night, trying to have her go with him. In addition to what the plaintiff said, two witnesses testified to his whipping the horse and swearing when he was trying to get him into the stable. According to one of them he said, " I will get that horse tired so he will come

back so he will go in," and after that said, " he would die or the horse would die — something like that." Both these witnesses said he seemed to be under the influence of liquor.

In the absence of any evidence that he was taking precautions against driving out of the road into the mill yard and driving over the wall, the jury could not find affirmatively that he was in the exercise of due care.

The only remaining exception was to the admission of the testimony of the witness Hawes, that about seven o'clock that evening, as he was driving along on the Forge Road, not far from where the plaintiff's intestate lived, it was very dark, his " horse jumped right out and went sideways . . . and a team went by just like a shot." Whether the other° circumstances of the case made this circumstance of any significance for consideration in connection with the plaintiff's claim as to her husband's due care, was a question of fact to be determined by the presiding judge in passing upon the admissibility of the testimony. Unless the person who went by was the plaintiff's intestate, it was of no consequence. We are of opinion that the probabilities, depending upon a variety of facts, were such as to leave the admission or exclusion of the evidence within the discretion of the presiding judge.

*Exceptions overruled.*