CATHERINE HURLEY, administratrix, *vs.* CITY OF BOSTON.

Suffolk.     January 13, 1909. — May 20, 1909.

Present: KNOWLTON, C. J., MORTON, HAMMOND, LORING, & BRALEY, JJ.

*Way*, Defect in highway.   *Negligence.*

The fact that changes in a public street of a city are being made under authority of a statute providing for the abolition of a grade crossing does not relieve the city from its statutory liability for an injury to a traveller caused by a defect in the street, if no order has been made by the proper authorities of the city formally closing the street to public travel.

At the trial of an action of tort against a city under Pub. Sts. c. 52, §§ 17, 18, to recover for bodily injury to and the death of the plaintiff's intestate caused by his walking at night off an abutment which the plaintiff alleged that the defendant had made in a public street in raising its grade and had not properly guarded, it appeared that the changes in the surface were being made under the provisions of a statute abolishing a grade crossing of a railroad with a public street, that the street where the abutment was had not been formally closed to travel by any vote of the authorities having the right to close it, that no lights

or barriers had been placed on or near the abutment, that the street was one of several which proceeded from a public square about four hundred and fifty feet from the abutment, and that about two hundred and twenty-five feet from the abutment it was crossed at right angles by another street. Certain witnesses for the defendant stated that at the public square there were barriers, with lights and notices prohibiting travel on the street, placed across the street in question, but with spaces at the ends of the barriers large enough for persons to pass freely around the barriers, (one witness stating that there was a space of seven or eight feet at one end,) and that there were like barriers and lights across the intersecting street and on each side of but not in the street in question. There was other evidence tending to show that the public square was one much used, that many people lived and had business on the street in question and went back and forth around the ends of the barriers at the square, a beaten muddy path having been worn there by them, there being no sidewalk. The presiding judge, having left to the jury the special question whether the city maintained the barriers and lights described by the defendant's witnesses and the jury having answered affirmatively, ruled that there was no evidence of negligence on the part of the defendant. *Held*, that the ruling was wrong, since the special finding related only to the existence of the barriers and lights and the question, whether they were suitable and sufficient, still remained to be passed upon by the jury.

A traveller on a city street in many cases may be justified in thinking that a notice that the way is closed to public travel, placed upon a barrier in the street, is no broader in its scope than the barrier to which it is attached and that the thing closed to public travel is only that part of the street which is shut off by the barrier.

At the trial of an action of tort under Pub. Sts. c. 52, §§ 17, 18, against a city to recover for bodily injury to and the death of the plaintiff's intestate, a woman about sixty years of age, caused by her walking on a dark night off an abutment thirty feet high in a public street made by the defendant in the course of raising the grade of the street, there was evidence tending to show that the abutment was about four hundred and fifty feet distant from a public square, that there was no obstruction in the street between the square and the abutment, that there were barriers in the street at the square, but with ample room at both ends for persons on foot to pass them and a muddy path worn there where persons had done so, that the plaintiff's intestate lived on a street near the street in question and had not been on the latter street since work had been begun thereon by the city, that on the night of the accident she entered the street by passing the barriers at the square and walked straight ahead, thinking that her path was clear until, without warning, she fell. *Held*, that the question, whether the plaintiff's intestate was in the exercise of due care, was for the jury.

TORT under Pub. Sts. c. 52, §§ 17, 18, to recover for the bodily injury and subsequent death of Ann Fuller, the plaintiff's intestate, alleged to have been caused by her falling over an embankment, which was negligently left unguarded by the defendant in the progress of raising the grade of Swett Street in South Boston. Writ in the Superior Court for the county of Suffolk dated December 6, 1900.

The case was tried before *Bond*, J.   The facts and the course of the trial are stated in the opinion.   The presiding judge ordered a verdict for the defendant; and the plaintiff alleged exceptions.

*W. F. White*, for the plaintiff.

*A. L. Spring*, for the defendant.

HAMMOND, J.   This is an action under Pub. Sts. c. 52, §§ 17, 18, to recover for personal injuries to the plaintiff's intestate, and is before us upon exceptions to the order of the judge presiding at the trial directing a verdict for the defendant.

Although the changes in the surface of Swett Street were being made under St. 1897, c. 519, still, inasmuch as no order appears to have been made by the proper authorities of the defendant city formally closing the street to public travel, the statutory liability of the defendant to protect the public travel still remained.   *Torphy* v. *Fall River*, 188 Mass. 310.   The only questions practically in dispute were whether the plaintiff was careful and the defendant negligent.

1. As to the negligence of the defendant: At the close of the evidence the trial judge, having refused to order a verdict for the defendant, submitted to the jury the following question: "At the time of the injury to the plaintiff's intestate, did the city maintain at the entrance of Swett Street, at Andrew Square, horses and lanterns, with the notice substantially as testified to by the witness Feeley, so that they could be plainly seen by light from the street lights from the locality in Andrew Square, by persons passing there on Swett Street, and did the city at the time of the accident maintain at the entrance to Ellery Street horses and lights, as testified to by the witnesses?"

The jury answered this question in the affirmative, whereupon the presiding judge ordered a verdict for the defendant.   It will be observed that the question submitted to the jury was not whether the barriers and lights were suitable and sufficient, but only whether they existed.   The subsequent order directing a verdict was therefore in substance a ruling that as matter of law the barriers and lights found by the jury to have existed were legally sufficient to relieve the defendant, or, in other words, that there was no negligence on the part of the defendant. The verdict of the jury simply established that the barriers and

lights existed at Andrew Square as described by Feeley, and at Ellery Street as described by him and the other witnesses.

It appeared that there "were no railings, guards, barriers, lights or other thing or contrivance, either upon said abutment itself [from which the plaintiff fell] or near said abutment, to warn persons of its presence or the fact that there was any hole or other dangerous condition beyond it." There was evidence that Andrew Square was about four hundred and fifty feet easterly from the abutment, and that Ellery Street crossed Swett Street substantially at a right angle, about two hundred and twenty-five feet from Andrew Square, or about half way between the square and the abutment.

The witness Feeley, a police officer, testified as to the barriers and lights as follows: "That on the night of the accident and on previous nights there were no lights or railings on the abutment, and that the nearest lights thereto were two lights on wooden horses, one a white light on a horse placed to the north of Swett Street across the line of Ellery Street, the other a red light on a horse placed to the south of Swett Street in the line of Ellery Street; these horses covered the whole of Ellery Street; that on the night of the accident about all the earth was in and Swett Street was practically graded up to the abutment; that Geer's factory was very near the abutment." And on cross-examination he testified as follows: "That about ten feet from Andrew Square to the west on Swett Street there were three horses, with two red lanterns on each, each horse measuring from twelve to fifteen feet, and that behind the horses were some dirt and some large stones such as are used for curbstones, he should say one curbstone on either side; that the dirt was that used in grading and went along up the slope; that the street was not paved; that there was a sign about four feet by three on the centre horse, which read in substance, 'Street closed to travel while grading. Persons crossing or using the street do so at their own risk'; that the sign was white and the letters black, its lower edge being about three and one half feet from the ground; that at Andrew Square there are five streets intersecting, a very busy place night and day, with one electric light on the northerly corner of the Square and Dorchester Avenue, and another at the intersection of Boston Street and

Dorchester Avenue; that they were the ordinary arc lights on the large thirty foot poles; the witness had no trouble in seeing this sign and what was printed upon it, at night; nothing obstructed the view of a person coming from Dorchester Street crossing the Square and intending to go to Swett Street, of the horses, lights and sign except the ordinary street travel. Witness stated that no one could get to [the] abutment by any street, except they passed the three horses with lights and sign at Andrew Square and Swett Street, or the horses across Ellery Street near the intersection of Ellery Street and Swett Streets." He further testified that there was space enough for people to go between the building called Farrell's saloon on the north side of Swett Street and the north end of the horse nearest that side; that a similar situation existed on the south side of Swett Street; that on either side there was room enough to go around the end of the horses. The testimony of the other witnesses did not vary from this, except that one witness stated that the distance between the horse and Farrell's store was about seven or eight feet. The presiding judge ruled as matter of law that these barriers and lights with the notice were sufficient, and having so ruled ordered, as above stated, a verdict for the defendant.

There was evidence that there were houses and other buildings on the north side of Swett Street, reaching from Andrew Square westerly to Ellery Street, and also some buildings on the south side of Swett Street between the Square and Ellery Street; that although there was no regularly constructed sidewalk, yet "there was a lot of stuff beaten down there," muddy and not so hard as an ordinary sidewalk. There was evidence that many people passed upon the north side of the street to and from the buildings on that side, including a factory employing ten or fifteen hands. There was evidence that during the month in which the accident occurred, "after six o'clock people went up Swett Street from Andrew Square on the north side, crossed over, and at a point on the southerly side about eighteen feet from the abutment went down the embankment for a short cut, crossed the railroad location at grade, and that people coming from the west side of the abutment came up this embankment on to Swett Street to get to Andrew Square."

The street was not formally closed to public travel by any vote of the authorities having the right to close it. The obstruction to the travel was a very dangerous one. Against the liability to a plunge down this embankment it was the duty of the defendant to use due care to protect the public travel. It placed no barriers or lights or anything whatever at or near the embankment. About two hundred and twenty-five feet easterly of the embankment there were lights and barriers on each side of Swett Street, shutting off Ellery Street. But these barriers were not across Swett Street, and they were no obstacle to the progress of the traveller. To a person not familiar with the surroundings they may have indicated to the traveller, not that there was trouble with Swett Street, but rather with Ellery Street.

Apparently the only things relied upon to keep the traveller from the embankment were the wooden horses, lights and notice at or near Andrew Square. These horses did not stretch entirely across the street. Upon each side there was a part of the street, that upon the north side being described by one witness as about seven or eight feet wide, which was not blocked by the horses. What such a barrier may be fairly understood to mean depends upon circumstances. In the case of a country road where only a narrow strip is worked for public travel either for pedestrians or for carriages, a barrier erected across the whole of that strip might well be regarded as sufficient, especially if accompanied by a notice that the street is closed to public travel. Such a barrier is an obstruction to every one who seeks to travel in any part of the road set apart for public travel. But the case may be different in a city where the whole of the road is worked for public travel. In the case of such a street a barrier erected across the part used for carriages but not across the sidewalk or part ordinarily used by pedestrians, may be interpreted by the traveller as being intended to stop the progress of carriages, but not of pedestrians upon the sidewalk; and many times that interpretation will be correct. And even if there be a notice that the street be closed to travel while grading, the question is not absolutely concluded against the traveller. In many cases he may be justified in thinking that the notice is no broader in its scope than the barrier, and that the thing closed to public

travel is only that part of the street which is shut off by the barrier.

In view of the great amount of public travel in the vicinity of Andrew Square, the fact that a portion of the street was not physically closed against the steps of the traveller, the dangerous character of the defect and the other circumstances of the case, we are of opinion that the question whether proper care was taken by the defendant to see that the path of the traveller was safe, was for the jury. The case must stand with a class of cases of which *White* v. *Boston*, 122 Mass. 491, and *Jones* v. *Collins*, 188 Mass. 53, are types.

2. As to the due care of Ann Fuller, the plaintiff's intestate: There was evidence that she was about sixty years of age, unable to read and write, but a "smart, bright appearing woman for her age"; that she lived on Dorchester Street, near Swett Street, and that she had not been on Swett Street since the repairs began. The jury might have found upon the evidence that she entered Swett Street at Andrew Square and must have passed by the barriers. The exact course she took was not clear, but after she passed these barriers there were no obstacles to her progress until she reached the embankment from which she fell to the railroad bed thirty feet below. The night was dark. A few hours after the accident, in reply to a question from her daughter as to how the accident happened, she said, "I don't know, dear; I thought I was going right straight along, and I thought everything was all right until in one moment I was down and that was the last of me, I was over." A jury may conclude that this language has in it the ring of sincerity, and that this woman supposed her path was clear, and further that she was justified in so thinking. Under all the circumstances the question of her due care was for the jury. *White* v. *Boston*, 122 Mass. 491.

*Exceptions sustained.*