ERNEST M. STOLIKER *vs.* CITY OF BOSTON.

SAME *vs.* DANIEL J. KILEY.

SAME *vs.* CAHILL CONSTRUCTION COMPANY.

Suffolk. November 15, 1909. — February 11, 1910.

Present: KNOWLTON, C. J., MORTON, BRALEY, SHELDON, & RUGG, JJ.

*Negligence,* In use of highway, Of contractor with city in working in highway. *Way,* Defect in highway, Notice. *Notice. Insane Person. Guardian.*

At the trial of an action by a teamster to recover for personal injuries alleged to have been received by reason of a wagon which he was driving striking against a timber in a pile of lumber placed in a public street in a city by a contractor who was engaged in widening the street, whereby the plaintiff was thrown to the ground, it appeared that the street had not been formally closed to public travel, that over the street was the structure of an elevated railway, supported by rows of posts, that between the rows of posts were double tracks of an infrequently used freight railroad, that on the outside of the rows of posts on each side were tracks of a street railway, and that the operations of the contractor were confined to one side of the street only. There was evidence, bearing on the question whether the plaintiff was in the exercise of due care, which tended to prove that the contractor had put up barriers shutting off the street to within two feet of the outside rail of the street railway track on the side where the plaintiff was driving, that between the posts supporting the elevated structure, which were about two feet from the inner rail of the track, the contractor had piled parallel with the track rows of timber extending upward beyond a level with the hubs of passing vehicles, that the street had the heaviest freight traffic by wagons of any in the city, that street cars passed along every few minutes and that teams customarily did so during the entire time the contractor had been there, and used, as the plaintiff was doing when he was injured, the street railway track between the rows of posts and the piles of timber on one side and the work of

the contractor on the other; and a police officer, who was a witness for the defendant, testified in cross-examination that he considered that the street on that street railway track and each side of it was open and safe for public travel; there also was evidence that no barrier extended across the street clear up to the street car rail. On the other side of the street, the left side as the plaintiff was proceeding, there was room for teams to pass. *Held,* that the question, whether the plaintiff when injured was in the exercise of due care, was for the jury.

At the trial of an action by a teamster against a subcontractor who was performing a certain part of the work of widening a street in a city, there was evidence which tended to show that the street carried the heaviest freight traffic of any street in the city, and that at one side of a space in it which was about eleven feet wide and through which street cars and teams were passing during all the time the defendant was carrying on his work upon the street, the defendant had caused timbers to be so piled that one of them protruded so far that it was struck by a wagon which the plaintiff was driving and caused the plaintiff to be thrown to the ground. *Held,* that the question, whether the defendant was negligent, was for the jury.

At the trial of an action by a teamster for personal injuries caused by his being thrown from his wagon because of its having struck against a timber which negligently had been left protruding into the part of a street of a city which had been left open for travel while work of widening the street was in progress, it appeared that the defendant had undertaken the work of widening the street by a contract with the city, that he had made a subcontract with another person whose employees had negligently piled the timber, and that all the work being done on the street at that time was being done by the subcontractor. There also was evidence tending to show that the defendant daily was about the work, superintending not only his own foreman but also the subcontractor, and that he had placed certain barriers and lanterns at various places about the work to warn the public of the work going on. There was evidence tending to show that there was no barrier or warning against the use of the portion of the street where the plaintiff was driving when injured. *Held,* that the question, whether the defendant was negligent, was for the jury, who might have found that the defendant had assumed the duty of maintaining proper barriers to give notice that the part of the street where the plaintiff was driving was closed to travel, that he had failed to perform such duty, that he ought not so to have failed, and that but for such failure the plaintiff would not have been driving where he was injured.

At the trial of an action against a city by a teamster for personal injuries caused by his being thrown from his wagon because of its having struck against a timber which negligently had been left protruding into the part of a street which had been left open for travel while work of widening the street was in progress, it appeared that the city had made a contract for the entire work of the widening of the street with one who had made with another a subcontract for the performance of a part of the work, and that the defect which caused the injury to the plaintiff was due to negligence of the subcontractor. The street had not been formally closed to public travel. There were some barriers and warnings about the work, which, it might have been found, did not apply to the portion of the street where the plaintiff was driving when he was injured. The street might have been found to have carried the heaviest freight traffic of any in the city. An inspector on behalf of the city was constantly about the work which was being done by the contractor and the subcontractor. A police officer testi-

fied that he considered that the portion of the street where the plaintiff was driving was open and safe for public travel. *Held*, that the question, whether the city had exercised reasonable care and diligence to protect the public by barriers or otherwise against the obstruction which caused the plaintiff's injury, was for the jury.

In actions against a city, against a contractor and against a subcontractor, by a teamster who was injured by being thrown from his wagon because the wagon ran against a timber left by the subcontractor protruding into a portion of a street which the contractor and the subcontractor were widening, if the street had not formally been closed to public travel and no barrier had been placed across that portion of it upon which the plaintiff was driving, and such portion was being generally used by teams, and if there were barriers and warnings at other parts of the street and the progress of the work was apparent, the question for the jury in determining whether the defendants properly performed the duty of warning the plaintiff, is whether the plaintiff received reasonable notice and warning that repairs were going on in that part of the street where he was travelling such as naturally would lessen the safety of using it as a street and would call for the exercise of special care on his part; and if the jury should find that the plaintiff received such reasonable notice, and also should find that the plaintiff suffered from the existence of no other danger than that of which full notice and warning had been given to him, it cannot be said that either of the defendants had been guilty of negligence in that respect.

An adult, who was injured on an October 8 because of a defect in a highway, such as is described in R. L. c. 51, § 18, immediately became unconscious, and continuously thereafter was mentally incapable of giving the notice required by § 20 until on December 21 he was adjudged insane and his father was appointed as his guardian. On December 29 the father as guardian gave to the city a notice of the injury, signed by himself as guardian. *Held*, that the notice given by the guardian was sufficient under R. L. c. 51, § 21.

THREE ACTIONS OF TORT for injuries alleged to have been received by the plaintiff on October 8, 1904, a Saturday, between four and five o'clock in the afternoon by reason of his being thrown from a wagon which he was driving on Atlantic Avenue in Boston, because the wagon ran against a piece of timber negligently left protruding from a pile which had been placed at the side of the travelled way while the street at that place was being widened; the first action being against the city under R. L. c. 51, § 18; the second against Daniel J. Kiley, who had contracted with the city to do the work; and the third against the Cahill Construction Company, which was a subcontractor under Kiley as to a part of the work. Writs dated, respectively, July 5, July 20 and July 21, 1905.

The cases were tried together before *Stevens*, J.

A plan was used at the trial and at the argument before this court, of which the plan on the following page is a reduced copy.

Atlantic Avenue at this point was seventy-eight and one half feet in width. Over the middle of it ran the double elevated structure of the Boston Elevated Railway Company, supported by iron posts on each side placed at distances of about sixty feet apart, and under the structure in the middle of the street and between the rows of posts ran the double track of the Union Freight Railroad Company; on the east side, or water side, of the posts supporting the elevated structure in the street, and distant less than three feet from them, ran a surface track of the Boston Elevated Railway Company on which the north bound surface cars ran, and on the westerly side of the posts ran the south bound surface cars on a similar track. The distance be-

tween the posts and the curb of the sidewalk was about twenty feet on the easterly or water side and about fifteen feet on the westerly or land side. The width of the street railway track was four feet and eight inches. The distance from the westerly rail of the north bound track to the fender base of the posts was two feet two inches, the fenders extending nine inches from the posts.

One Robert F. Cooper, a witness for the plaintiff, testified that he was a salesman and worked for his father, who had a place of business on Atlantic Avenue on the harbor front nearly opposite where the accident occurred; that in October, 1904, the sidewalk in front of his father's premises and the street also near to the curbstone where they were putting in a new sea wall and toward the Metropolitan Steamship Company was all torn up to within a foot or two of the car track, so that one could see

the water beneath; the whole street was used for public travel, and on the easterly or water side teams used the portion where the street car ·track was and also the space between the track and where the repairs were going on and between the tracks and the posts of the structure of the Boston Elevated Railway Company; that portion of the street on the water side which was not torn up was used for teaming about a month before October 8, 1904, the day of the accident, and considerable travel took place there. The lumber, bricks and other material used in making the improvements were kept in different places; lots of timber were placed between the Elevated posts and some over on a lot of brick, such as they put in the sidewalk, on the corner of India Wharf; there were some other things put on Milk Street, but most of the timber was placed on Atlantic Avenue between the posts of the elevated structure, running from the head of Central Wharf; the lumber was piled three or four timbers high one on top of the other; there were timbers so piled between the posts in front of his store and to the south of it; the lumber had not been so piled there more than a week; it was piled lengthwise of the tracks, the timbers being about five feet long, single tiers, one piece on top of another, three or four pieces high, and two piles of timber running lengthwise with each other were between each two posts, except that between the two posts opposite his store only one tier or pile was placed; these timbers were distant from the nearest rail of the surface track so that a car had plenty of room to go by; such was the condition of the timbers on October 8, 1904, in all places but one; the witness saw teams passing there during that day.

The witness Cooper further testified that he saw the plaintiff on a rack wagon come along at a pretty good gait down Atlantic Avenue on the car track on the easterly surface track of the Boston Elevated Railway; he was going north, and his front wheel struck a piece of timber, and the horse started a little faster, and, as he did, the hind wheel struck a piece of timber, and the man was thrown in the street, and was dragged about ten feet. The hub of the front wheel struck the piece of timber on the end, and then the rear wheel struck the timber and chipped off a little piece and moved it out a little. During that day a great many teams had come along.

The same witness further testified that the work there was being done by the defendant Kiley; that there were two gangs of men: one gang, with a foreman, in the employ of the defendant Kiley, fixing the street, and the other gang, under one Cahill, fixing the sidewalk. The defendant Kiley was there about every day; the work was being done by him; "he seemed to be superintending all of the men that were working there: he would come along and talk with Mr. Cahill; then he would talk with his foreman in the paving division that he had paving there."

On cross-examination the witness Cooper stated that at the time of the accident the plaintiff's horse was not coming very fast, just barely jogging along "like any other team horse would come, trotting right along the car track."

One Thomas J. Keefe, a witness for the plaintiff, testified that he was driving a large express caravan immediately behind the plaintiff; that the plaintiff was jogging along, the horse was trotting very slow, not more than five miles an hour; that the wagon was running with its right hand wheel in the right rail of the track, and the left hand wheel on the outside of the track; "generally wagons are built so that one wheel will set in the track and the other set out; there are a very few wagons that will set in the track, with the exception of carriages, but wagons, as a rule, one wheel will either set in, the right wheel will set in, but the left wheel will project on the outside." The witness stated that he had driven through there at least two or three times a day every day previous to this day, and had driven through there in the forenoon of this day; that the condition of the street there relative to what was open for traffic was just about the same all the time while they were making the alterations; that there were no guards or danger signals there or flags. Other testimony of the witness Keefe was in corroboration of the witness Cooper.

One Austin M. Farwell, junior, a witness for the plaintiff, corroborated the two preceding witnesses and also testified that at the time of the accident he was driving behind the plaintiff and was separated from him by one team; that for a week and more previous to the accident the lumber had been piled up between the posts, and the witness had been along there pretty nearly every

day; that the west side of Atlantic Avenue was open, and on the east side the track and street on each side was open for teams during that week; that the condition of the street during that time was about the same as on the day of the accident, that he didn't notice any safeguards; that he did not see any wooden horses or flags; that there was room for two teams going up and down on the west side of Atlantic Avenue; that Atlantic avenue was quite a good deal crowded by travel on week days, especially in the afternoon, Saturday as well.

One David Bennett, a witness for the plaintiff, testified that he drove out from Metropolitan Wharf just after the accident and saw that the condition of one pile of lumber which was about ten feet back of the plaintiff's wagon as it then stood was disarranged, " the top was turned over that way, opposite, and the second one was tipped towards the wagon, one tipped in one direction and one in the other in this one pile "; that the witness's regular trips took him along Atlantic Avenue twice a day to the various boat lines and railroads, and that there is the heaviest traffic on Atlantic Avenue of any freight street in use in Boston; that Saturday afternoon is a little quiet, and it was exceptionally quiet that afternoon; on cross-examination the witness testified that a man driving a team northerly on Atlantic Avenue on that afternoon could either have gone in where the repairing was or have gone over on the Union Freight Railroad rail, and passed down the Union rail, towards State Street; that the whole street was vacant; that the witness's team was a heavy truck team and the plaintiff's team was not so wide, being a single team; that that morning the witness went along with his right wheel in the right rail of the track.

One Henry A. Young, a witness for the plaintiff, a contractor with a place of business opposite the place where the accident occurred, testified as to the condition of the place of the accident, and stated that he saw the accident happen; that the lumber was piled up between the track of the street car and the Union Freight Railroad track, and that there were stray timbers lying on the ground, single sticks on each side of the pile. The witness pointed on the map to the place where the accident occurred, between post numbered 126 and post numbered 127.

One Frank E. Nickerson, a witness for the plaintiff, testified

that the distance across between the outside hubs of the plaintiff's wagon was seven feet five inches; across between the outer rims of the tires, six feet six inches; that the rack of the wagon did not project over the wheels; that the front wheels stood lower than the back ones, and that the front hubs and axle were five inches nearer the ground than the back hubs and axle.

The defendant Kiley was called by the plaintiff and among other things testified that he had a contract with the city of Boston that was still pending in October, 1904, relating to a section on Atlantic Avenue; that he had a subcontractor, which was the defendant Cahill Construction Company, which under its contract did all of the timber work, including the furnishing of all labor, lumber and material connected therewith, and that the work done by the witness was the concreting, paving and laying of brick sidewalks wherever necessary and the setting of the curb; that all lumber and piling work was done by the Cahill Construction Company; that the witness's men were not at work in the neighborhood of this accident on the day of the accident, but had been at work there some time previously, had prepared it for Cahill and then had waited, so far as this section was concerned, until Cahill had completed his work; that the witness had done nothing in the street itself between the sidewalk and surface track; that he had not removed anything; that the entire pavement was still intact between the east rail of the north bound track and the curb or east wall; that he had no material at that point; that there were two wooden horses at the corner of India Wharf, and " at the entrance to the Metropolitan Steamship Company " a horse from the curb to the rail, or reaching close to the rail, and another horse, a shorter horse, between the rail of the street railway and the Union Freight rail, partly under the elevated structure, and that upon these horses in the daytime was a sign bearing the words, " Street closed for repairs, no passing through," and upon these horses at night was a lantern suspended; that he placed these barriers there to warn teamsters against possible danger; that the electric cars ran through on the north bound rail and they placed wooden horses on both sides of the rails; that the roadway from the old curb to the track was clear and the pavement was undisturbed in that entire section until after Mr. Cahill had finished his

work, which was some time subsequent to the accident; that it was the witness's business to come there to his work and spend as much of the day as he could; that on the day of the accident he had been there as late as three o'clock and had come back and passed along the place of the accident just immediately preceding it; that he had spent a good portion of the day around that location and was familiar with the condition of things in that location during the entire day; that the wooden horses and the lamps belonged to the witness; that the easterly surface track they had to leave open; that there were teams going in there behind the cars, and sometimes when there were no cars passing; that the horse which stood between the curb and the east rail of the street car track was eight or ten feet long; that at the point of the accident it was about nine feet from the east rail of the street car track to the curb and from two to three feet of that was occupied and six feet was unoccupied and undisturbed, clear; that the witness had given no instructions to any of the men to warn teamsters or others not to pass up into that section.

The evidence regarding the notice given to the defendant under R. L. c. 51, §§ 20–22, is stated in the opinion. On December 21, 1904, the plaintiff was adjudged insane, and his father was appointed his guardian. The notice was as follows:

" To the City Treasurer or the City Clerk of the City of Boston. Sir: — I hereby give you notice that on or about the 8th day of October A. D. 1904, between the hours of 4 and 6 o'clock in the afternoon, Ernest M. Stoliker of Everett in the County of Middlesex and Commonwealth of Massachusetts, was injured by reason of an obstruction to wit a pile of planks or timbers piled near the centre of the travelled part of the street or highway, known as Atlantic Avenue in the said City of Boston, nearly opposite number 272 of the said street or avenue. The said Stoliker while in the exercise of due care was thrown from a wagon which he was driving at that time by reason of coming in contact with said obstruction which was carelessly and negligently permitted to remain on said street or highway, being thrown from said wagon on his head, he received injuries which caused him to become insane and by reason of said insanity he was and is unable to give notice of the accident prescribed by law. On the 21st day of December A. D. 1904, the

undersigned James G. Stoliker was appointed guardian of Ernest M. Stoliker, an insane person, and this notice is given by the said James G. Stoliker as guardian of Ernest M. Stoliker. Dated this 29th day of December, A. D. 1904. James G. Stoliker, Guardian of Ernest M. Stoliker, by his attorney, Wm. L. Strickland, 54 Devonshire St., Boston."

Various witnesses for the defendant testified that, when injured, the plaintiff was driving very rapidly, and that just before he was thrown he was turning around in his seat and was waving his hand to some one behind him; that the roadway to the east of the north bound street railway track was clear for five or six feet. One John W. Corbett, an inspector of the work for the city, also testified on cross-examination that cars passed every seven or eight minutes, and that he saw a considerable number of teams passing on the track. "We were not supposed to keep teams out." One Duncan G. Chisholm, a police officer, stated on cross-examination that he considered that the street at the easterly surface track and each side of it was open and safe for public travel.

Recalled by the defendants, the defendant Kiley among other things on cross-examination testified as to what he understood about the track with some feet on each side of it being open for public travel, that he understood "if public after passing those notices or barriers that were there took their chances, why, that was their lookout"; that some teams would drive in there, and that "if you attempted to stop them some of them would drive over you; I never attempted to stop any, that was not my business, I was too busy"; that he kept no man regularly standing at India Wharf or India Street; that the contract and specifications required that the street car traffic proceed during the progress of the work, and they had no right to stop them; that witness knew that teams went through there regularly.

At the close of the evidence, the respective defendants asked that verdicts be ordered for them. The presiding judge instructed the jury to return a verdict for each defendant and also to answer the following questions:

"(1) At the time of the accident, was there a barrier near the head of India Wharf on the north side extending from the sidewalk towards the east track of the Boston Elevated Railway

Company with a sign that the street was closed for repairs, no passing through or words to that effect?

" (2)  At the time of the accident, was there a barrier between the easterly track of the Boston Elevated Railway Company and the easterly track of the Union Freight Railroad Company with a sign that the street was closed for repairs, no passing through or words to that effect? "

The jury answered the first question " Yes " and the second question " No."

The plaintiff alleged exceptions.

*W. B. Grant*, for the plaintiff.

*J. D. McLaughlin*, for the city of Boston.

*D. J. Kiley*, (*H. D. Crowley* with him,) for Kiley.

*D. B. Ruggles*, for the Cahill Construction Company.

SHELDON, J.   1.  The first question in these cases is whether the jury would have been warranted upon the evidence in finding that the plaintiff was in the exercise of due care.   Looking only at his conduct while driving on the street railway track, between the post of the elevated railway where the piles of timber had been put and that part of the way where the paving had been taken up and passage was obstructed, we are of opinion that such a finding could have been made.   He was driving along in the ordinary way, going at only a slow trot, upon a part of the street which had not been disturbed, which it was agreed had been left open for the passage of street cars, and which upon the evidence the jury might say was openly and commonly used by other teamsters in the very way that he was using it.   *Lyman* v. *Hampshire*, 140 Mass. 311.   *Maguire* v. *Fitchburg Railroad*, 146 Mass. 379.   *Thyng* v. *Fitchburg Railroad*, 156 Mass. 13.   *Hyde* v. *Boston*, 186 Mass. 115.   *Jones* v. *Boston*, 197 Mass. 66.   He had no reason to apprehend that the timbers piled under the elevated railway had been so laid that their ends would protrude into the street and make it dangerous for him to pass in a place apparently left open for him and others to use.   The jury might say that he was not negligent in failing to see the slight protrusion of the end of one timber as he approached it, although of course this question would be for them to determine.   *Moret* v. *George A. Fuller Co.* 195 Mass. 118.

But the plaintiff entered upon this part of Atlantic Avenue from the east, at India Wharf; and it was perfectly manifest to him at that time that the east side of the avenue was undergoing repairs, that the pavement on that side and the sidewalk had been partly torn up and that passage was otherwise obstructed; and the jury have found, in answer to a question put to them by the judge, that there was at this time a barrier near the head of India Wharf, on the north side of the entrance to the avenue, extending from the sidewalk towards the east track of the street railway, "with a sign that the street was closed for repairs, no passing through, or words to that effect." The evidence makes it certain that the plaintiff must have passed this barrier. Could it have been found that this was consistent with the exercise of due care on his part?

It has not been found, and it was not contended at the trial, that this barrier extended all the way from the sidewalk to the railway tracks. It seems to have guarded only the space of the roadway which actually had been made impassable for public travel. There was evidence that besides the space occupied by the railway tracks a considerable width of the street surface had been left untouched and in condition for travel. This space according to most of the evidence was a foot and a half or two feet wide; it was adjacent to the car tracks and increased so far the width east of the elevated structure that was left open and available. The defendant Kiley, however, testified that the roadway from the old curb to the track was clear and that the pavement was undisturbed in that entire section until some time after the accident. The plaintiff is entitled on these exceptions to have the most favorable view possible of the evidence taken: and if this testimony of Kiley's were believed, it might be doubted whether there was any ground for imputing negligence to the plaintiff in entering upon this part of the avenue. But we prefer to consider the question upon the other evidence.

It recently has been held by this court that a traveller on a city street in many cases may be justified in thinking that a notice placed upon a barrier in the street that the street is closed to public travel is no broader in its scope than the barrier itself, and that only that part of the street which is actually shut off by the barrier is intended to be closed to public travel. *Hurley* v. *Bos-*

*ton,* 202 Mass. 68. This applies to cases in which the whole of the road is worked for public travel, but only a part of its width is shut off; and it must apply more forcibly in a busy and crowded street and in cases where upon the apparent indications a part of the width of the street is not only not shut off, but according to the indications on the surface of the ground has purposely been left open for travel. But the jury could find that this was the case here. There was testimony that Atlantic Avenue was a crowded street, carrying the heaviest traffic of any freight street in Boston; and although one witness testified that Saturday afternoon is a little quiet, and that it was exceptionally quiet on the Saturday afternoon on which this accident happened, the testimony of another witness was that " Atlantic Avenue was quite a good deal crowded by travel on week days, especially in the afternoon, Saturday as well." And the jury could well find, on all the testimony, that there was much travel on this side of that avenue at the time of the accident. We already have seen that it could be found that the location of the barrier, the condition of the street, the regular current of travel, and the open and common use of this side of the avenue indicated that there was no intention to close this part of its width to public travel. Corbett, the inspector of the city of Boston at this place, a witness for the defendants, testified that cars passed here every seven or eight minutes, and that he saw a "considerable number of teams passing on the track"; and he added, "We were not supposed to keep teams out."

Undoubtedly the plaintiff's knowledge of what was going on here and of the conditions that existed on the easterly side of this avenue was to be considered against him, especially in view of the testimony that he might safely have driven on the westerly side of the elevated structure. The care which he was bound to exercise must be proportioned to the visible dangers and to whatever notice or warning was given to him by barriers, signs or otherwise. But these considerations were for the jury. *Weare* v. *Fitchburg,* 110 Mass. 334. *George* v. *Haverhill,* 110 Mass. 506. *Kelly* v. *Blackstone,* 147 Mass. 448. *Norwood* v. *Somerville,* 159 Mass. 105. *Torphy* v. *Fall River,* 188 Mass. 310. *Campbell* v. *Boston,* 189 Mass. 7. *Cutting* v. *Shelburne,* 193 Mass. 1. *Winship* v. *Boston,* 201 Mass. 273. The jury could

find, from the appearance of the street and the barrier and the manner in which the unbarricaded part of the street continued to be used for public travel with the apparent ·consent of the city and of the contractors, that the plaintiff had a right to suppose that the part of the street which he was using was intended so to be used. *Leonard* v. *Boston*, 183 Mass. 68. *Learoyd* v. *Godfrey*, 138 Mass. 315, 323. Nor could it be said as matter of law that it was negligence for him not to go over to the other side of a crowded street like this,. where he might apprehend that it would be difficult for him to go in the direction that he wished to take. This is the converse of *Davis* v. *Whiting & Son Co.* 201 Mass. 91, 95.

This plaintiff did not, as was the case in *Compton* v. *Revere*, 179 Mass. 413, enter upon a street which he knew was not graded or fit for travel. The jury could find that instead of disregarding a notice that a part of the street was unfit for public travel, as in *McFarlane* v. *Boston Elevated Railway*, 194 Mass. 183, he adapted his conduct to the requirements of the notice by confining himself and his wagon to that part of the street to which the notice was not intended to apply. There was no evidence of such reckless conduct on his part as was testified to in *Wood* v. *Westport*, 185 Mass. 567.

We are of opinion that the question of his due care should have been submitted to the jury.

2. There was evidence of negligence of the Cahill Construction Company, not only in the erection of this pile of lumber without proper guards or barriers, but in allowing at least one piece of timber to be put upon the pile which it placed between the posts of the elevated railway so as to protrude over that part of the way which was left open and designed for public travel. This was manifestly dangerous and likely to produce just such an accident as in fact happened. *Brooks* v. *Kinsley Iron & Machine Co.* 202 Mass. 228, 232. Cooper testified that he saw this state of affairs on the morning of the day of the accident; the jury could find that it so continued until after four o'clock in the afternoon, when the accident happened, and that it was the cause of the plaintiff's injury.

3. It appeared that the defendant Kiley had made a contract with the city of Boston which included the work that was being

done on Atlantic Avenue at the time. He was called as a witness by the plaintiff and testified that he had made a subcontract with the Cahill Construction Company, under which that company did all of the timber work, including the furnishing of all labor, lumber, piling and other material, while Kiley himself attended to the concreting, paving and laying of brick sidewalks wherever necessary; that all the work that was going on at the time and place of the accident was being done by the Cahill Company's men; and that Kiley and his men were doing no work here and had nothing to do with the Cahill Company's work but were simply waiting until that company should have finished what it had contracted to do. He also testified that he had no control over the Cahill Company's men and no right to direct them or interfere with them at all, and that he did not do so. It was undisputed that the timber against which the plaintiff's wagon struck had been piled there by the Cahill Company. There was other evidence however that Kiley had been about the scene of the accident not only on this day, but on every other day, apparently superintending all the men who were working there, and talking with his own foreman and with Cahill, who was acting for the Cahill Company. It also could have been found on Kiley's testimony that he had taken charge of putting up and maintaining barriers with proper signs to close this part of the avenue to travel; and he testified that he had placed such barriers, one extending from the curb to the surface track, and the other between the surface track and the Union Freight Railroad under the elevated structure. But the jury found that there was no such barrier in position as the one last mentioned.

If we assume upon this evidence that Kiley could not have been held liable for the negligence of the Cahill Company as an independent contractor, we are yet of opinion that the plaintiff had a right to go to the jury in the suit against Kiley. It may be doubted whether there was not some evidence that this defendant was exercising control over all the work. *Learoyd* v. *Godfrey*, 138 Mass. 315, 323. However that may be, it could be found that Kiley had assumed the duty of maintaining proper barriers to give notice that this part of the street was closed to travel; that he failed to do this, as to a part of the width that

ought to have been shut off; that under the circumstances he ought not so to have failed; and that but for this failure the plaintiff would not have entered here. The case is not like *Jones* v. *Collins*, 177 Mass. 444. That decision turned upon the fact that the contractors had given reasonable notice by appropriate barriers and signs that the whole street was closed to travel, which was sufficient to exonerate them. *McFarlane* v. *Boston Elevated Railway*, 194 Mass. 183. The jury could find that that was not so in this case. It was for them to say whether the defendant had used proper care to protect the travelling public. *Jones* v. *Collins*, 188 Mass. 53.

Accordingly the case against Kiley ought to have been submitted to the jury.

4. The city of Boston stands, to be sure, in a somewhat different position from that of the defendants in the other cases. But there had been no formal or technical closing of any part of this avenue, and the case is within the second class mentioned by Loring, J., in *Jones* v. *Collins*, 188 Mass. 53. There is no question that this pile of timber, put up in the manner that it was, could be found to be a defect in the way. *Griffin* v. *Boston*, 182 Mass. 409, and cases cited. *Bennett* v. *Everett*, 191 Mass. 364, 368. *Davis* v. *Charlton*, 140 Mass. 422. *Haberlil* v. *Boston*, 190 Mass. 358. This obstruction had been put in the street with the consent and under the authority of the city, by virtue of a contract made by it with Kiley; the obstruction had remained there a considerable time, although occasionally somewhat changed by the removal of some timbers and the addition of others; the locality and the progress of the work had been under the constant observation of an inspector of the city. The city might be found to have had reasonable notice of the existence of the defect. *Pratt* v. *Cohasset*, 177 Mass. 488. Accordingly the question arose whether reasonable care and diligence had been used to protect the public by barriers or otherwise against this obstruction temporarily in the way. *Jones* v. *Collins*, 188 Mass. 53, 55, and cases cited. *Winship* v. *Boston*, 201 Mass. 273. *Jones* v. *Boston*, 197 Mass. 66. *McMahon* v. *Boston*, 190 Mass. 388. *Torphy* v. *Fall River*, 188 Mass. 310. *Butman* v. *Newton*, 179 Mass. 1. And if the city chose to intrust that duty to Kiley or the Cahill Company, it became liable for their failure,

as it would have been for its own. *Blessington* v. *Boston*, 153 Mass. 409. *Brooks* v. *Somerville*, 106 Mass. 271. Whether this duty had been complied with was under the circumstances a question for the jury. See the cases cited above.

In *McFarlane* v. *Boston Elevated Railway*, 194 Mass. 183, and *Jones* v. *Collins*, 177 Mass. 444, we already have seen that it appeared or was assumed that the street or the part of it in question had been either technically closed or fully guarded by sufficient barriers and signs. In *Compton* v. *Revere*, 179 Mass. 413, the street was ungraded and wholly unfit for travel. Of course the defendant's contention that the condition of this part of Atlantic Avenue indicated that it was not open to the public must be considered by the jury; but under the other circumstances which have been mentioned it could not be ruled as matter of law that this contention was made out.

5. As to this part of each one of the cases, the question will be whether reasonable care was taken, by barriers, warning or otherwise, to protect the public from the existing dangers. It was not necessary, and might be a great public inconvenience, to close the street absolutely to public travel. In this respect both the city and each one of the other defendants had done its full duty, although it had not physically excluded all travellers even from that part of the street upon which work was going on, if, either by erecting and maintaining sufficient barriers or by posting notices or by other suitable means, it gave warning to all travellers coming to this part of the street, that it was unsafe for travel; that though not formally closed, it had yet been practically withdrawn from the space designed and appropriated for travel. *Winship* v. *Boston*, 201 Mass. 273, 275; *McFarlane* v. *Boston Elevated Railway*, 194 Mass. 183. The questions for the jury will therefore be whether the plaintiff had reasonable notice and warning that repairs were going on in that part of the street on which he was travelling, such as naturally would detract from the safety of using it as a street and would call for the exercise of special care on his part. If this was the case, and if he suffered from the existence of no other danger than that of which full notice and warning had been given to him, it could not be said that either one of the defendants had been guilty of negligence in this respect.

6. But no action could be maintained against the city of Boston unless it had had notice of the time, place and cause of the injury. This notice must be given "in writing, signed by the person injured or by some person in his behalf," within thirty days after the happening of the injury; but "if by reason of physical or mental incapacity it is impossible for the person injured to give the notice within the time required, he may give it within ten days after such incapacity has been removed." R. L. c. 51, §§ 21, 22. In this case the accident happened October 8, 1904. There was evidence that the plaintiff immediately became unconscious, and ever since has been of unsound mind and has not now and never has had any recollection of the accident. His father was appointed his guardian on December 21, 1904, and on December 29, 1904, gave to the defendant due notice in writing signed by himself as guardian.

There was evidence that the plaintiff has always since the accident been unable to give notice personally by reason of mental incapacity. This evidence was stronger than what was held to present a question for the jury in *Barclay* v. *Boston*, 167 Mass. 596, and comes up to the standard that appeared in the same case in 173 Mass. 310. It might have been found to show the complete incapacity which was lacking in *Nash* v. *South Hadley*, 145 Mass. 105, *May* v. *Boston*, 150 Mass. 517, *Saunders* v. *Boston*, 167 Mass. 595, and *Ledwidge* v. *Hathaway*, 170 Mass. 348. The intimation in *Cogan* v. *Burnham*, 175 Mass. 391, that both physical and mental incapacity must be shown was made in a case in which only physical incapacity appeared, and there was nothing to indicate that the person injured could not have procured the notice to have been given by some one in his behalf. Here there was such evidence.

But the counsel for the city contends that the father of the plaintiff might have given the notice in his behalf. It may be assumed that this is so; but there was no duty to give the notice incumbent on the father, as perhaps there would have been in the case of a minor child; and it does not follow, in a case coming within the statutory provision, that the plaintiff's administrator, if he had died, or his guardian when appointed, could not give the requisite notice if they did so in due season after their appointment. This is indicated by the reasoning of

the court in *Taylor* v. *Woburn*, 130 Mass. 494, *Nash* v. *South Hadley*, 145 Mass. 105, and *Lukkonen* v. *Fore River Ship Building Co.* 197 Mass. 586. It is difficult to see how the rights of the plaintiff, if his condition entitled him to the privilege given by the statute, could be affected or impaired by the inaction of his father or of any relative or friend other than his duly appointed guardian.

It was the duty of the guardian when appointed to "appear for and represent his ward in all actions, suits and proceedings." R. L. c. 145, § 25. The giving of the notice was an essential step in prosecuting this action. *Madden* v. *Springfield*, 131 Mass. 441. Accordingly it was the right and the duty of the guardian to give the notice. He gave it seasonably after his appointment. It sufficiently showed on its face that it was signed by the guardian in behalf of the plaintiff. *Carberry* v. *Sharon*, 166 Mass. 32. *Higgins* v. *North Andover*, 168 Mass. 251. If the jury found that the plaintiff up to that time was incapable of giving the notice, or of procuring it to be given by another, we are of opinion that the notice given by the guardian was sufficient under the provisions of R. L. c. 51, § 21, already referred to.

In each one of the three cases the order must be

*Exceptions sustained.*