CHARLES H. LEAROYD, executor, vs. JOB M. GODFREY.

Bristol. Oct. 28, 1884. — Jan. 9, 1885. C. ALLEN & COLBURN, JJ., absent.

The owner of premises may be liable to a person lawfully there, by request of a tenant of a portion of them, for an injury caused by a defect therein, although there is an unasserted right in the premises outstanding in an assignee of a lessee of such owner, if the owner is in the possession and control of that part where the accident happened, and let the premises in their defective condition.

An officer, who enters upon premises at the request of a tenant, for the purpose of arresting a person there engaged in disturbing the peace, may maintain an action for an injury caused by their defective condition, while leaving them with the offender in his custody.

If the appearance of premises is such as to indicate an open space as the mode of approach to a certain portion thereof, in an action by a person lawfully thereon, for an injury caused by a defect in such open space, the jury would be warranted in finding, from the absence of any marks defining and separating the approach proper from the rest of the space, that the plaintiff was properly where he was injured.

If a person, who lawfully enters in the dark upon premises with which he is unfamiliar, and, upon coming to an obstacle fifteen inches high, consisting of a curbing of stone and plank around a well in an open space, steps upon it, and then forward, and, through an opening, into the well, he cannot be said, as matter of law, not to be in the exercise of due care.

TORT, for personal injuries occasioned to Thomas Booth, the plaintiff's intestate, by stepping into a well on premises of which the defendant was the owner in fee, but which were let by him as hereinafter appears. Trial in the Superior Court, before *Knowlton*, J., who allowed a bill of exceptions in substance as follows :

The premises are situated on the westerly side of School Street, in Taunton, and there were four buildings thereon, occupied by different tenants as residences, two on the line of the street and two in the rear. Between the two houses on School Street was a space eleven feet and three inches wide at the street end, and continuing of that width for a space of thirty feet and four and three fourths inches, when between the L of the front southerly building and the front northerly building it became seventeen feet and seven and a quarter inches wide, and continued of that width until the open back yard was reached. This space between the houses was the only entrance from the street for persons having occasion to go to the rear buildings and to the

northerly front building. The positions of the houses on the land are shown on a plan used at the trial, a copy of which is printed in the margin.*

The only obstructions in this space were two flights of steps attached to the northerly front building, and a well. One flight of steps was near the street, and the other about eight feet from the westerly end. The steps were about twenty-three inches high and extended into the space about two feet and ten inches.

100 ft.

N

Mrs. King's.

146 ft.

Well.

North Front House.

Unfinished House.

South Front House.

30 ft. 4¾ in.

Passageway.

30 ft.

11¼ ft.

School Street.

The centre of the well was about four and a half feet southerly from the southwesterly rear corner of the northerly front house. The stone work of the well was eight inches above the ground and on top of this was a curbing of joists and planks seven inches thick, making the total height above the ground fifteen inches. On the planking there was a board one inch thick which covered the well, except a space two feet in length and a foot and a half wide, which was open and uncovered, and had been open for about two years before the accident. The open space between the southeasterly corner of the planking and the northwesterly corner of the L of the southerly house was a little over eleven feet.

The plaintiff put in evidence a lease of the whole premises from the defendant to Lewis E. Field, dated October 25, 1869, for the term of twenty-five years from November 1, 1869, with a privilege of a lease for seventy-four years longer. It was in the usual form, with a right of assignment, and a right in the lessor or his assigns to terminate it after thirty days' notice in writing of the lessee's failure to pay the rent and taxes as stipulated, and with the privilege to the lessee of removing the buildings then on the premises; but, at the termination of the lease, the lessee was to leave a building or buildings thereon of the value of $1000.

The plaintiff also put in evidence a lease from Field to Thomas O. Falvey, dated July 1, 1870, for the term of twenty years from date; a mortgage by Field of his interest in the premises to John D. G. Williams to secure the payment of $1000, dated August 29, 1874; an assignment by Falvey of all his interest in the premises to A. K. Williams and several other persons, dated June 1, 1873; a release by Field to said A. K. Williams and others, dated June 10, 1876, of all their liabilities to him under their lease; a quitclaim deed from Field to John D. G. Williams, containing an acknowledgment of the foreclosure of the mortgage, dated November 28, 1876; and a quitclaim deed from John D. G. Williams to the defendant, dated March 28, 1877, and also an assignment of the mortgage from him to the defendant. These instruments were duly recorded in the registry of deeds at or within a few days of their respective dates.

The plaintiff called the defendant as a witness, who testified as follows: " I knew the premises; I have let them since 1877.

Mr. Falvey acted as my agent to collect the rents; then I got the rents. Then I had Calvin Ellis to collect the rents; I cannot say whether Ellis collected the rents. At the time of the accident I had half a dozen tenants there at least. All the buildings except the two front southerly ones were put on by Field, the lessee, or parties holding under his lease. The two buildings in the rear and the unfinished northerly building were put there by them. They were already occupied by tenants as residences when I got possession. The rear northwesterly tenement Mrs. King occupied, and I think paid $3 per month. After J. D. G. Williams gave up in 1877, I collected the rents. I cannot say whether Mrs. King was there at that time. There were one or two other tenements in this building occupied by tenants. Some of the tenants have been in the premises for a good many years. The space between the two front houses was the passageway to go to the houses in the rear; and, so far as I knew, the tenants used it. I used it myself in going upon the premises, and I gave no one of them any exclusive right there. In letting, there was nothing said about the well at all. There was no other well on the premises. I can't tell whether there was any curbing or pump there in 1877. I knew most of the assignees of the lease from Falvey to A. K. Williams and others. Nothing has occurred between us. I have talked with them about the lease, but could get no satisfaction. I have kept an account of the rents I have received. I don't remember how the well was in 1877. No fault has been found about the curbing. The tenants have asked me to put in a pump. A pump has been put in since this suit commenced. I have had Joseph F. Etter to do some carpentering. He never said anything to me about the well being dangerous. He did not say to me, 'Somebody will get drowned there,' nor I reply, 'Let them drown.' I have no recollection of any such remarks. The well is about twelve feet deep, and I helped my father to dig it about forty years ago. There was a good well curb around the well, of the usual height, about three feet, when I leased the premises to Field."

Lewis E. Field testified that he released A. K. Williams and others from all their obligations to him under their lease, for $600; and that since then said A. K. Williams and others had had nothing to do with the premises, to his knowledge.

The deposition of Thomas Booth, the plaintiff's intestate, was then read, the material portions of which are as follows : " I was a constable, and on the police force of Taunton, on November 19, 1881. At ten o'clock that night, by orders from the police station, I went to the premises on School Street said to be Job M. Godfrey's place. I had never been inside the premises before that I remembered; I may have been at the entrance. I did not know there was a well there, and I did not see one when going in or coming out until I stepped one leg in. I went there to stop a disturbance of the peace I was told was taking place there. I found Edward King there drunk. He threatened to knock his sister's head off, and was making considerable noise, so that we heard him before we got there. I arrested him. I took him by his left arm. He made no resistance. I came out, his left arm in my right, till I reached this obstacle as I call it. I did not know what it was. When I got to the place, the well, I went to step over, as I thought, when I got my right foot on the curbing it raised me up so to step further with my left, I stepped my left foot in the well. I dropped down till my left side struck the top of the well. It knocked the wind out of me, and I hollaed as well as I could. One of the officers came and assisted me up out of the well. It was three or four minutes before I could go on. I then got King on my arm and he came along quite easy, and I went to the station with him. King walked pretty well for a man who was drunk "

Captain Hopkins and three police officers, Littlejohn, Doherty, and Thomas, testified to the following facts: Annie King, daughter of Mrs. King, who had a tenement in the rear north-westerly building, came to the police station, and said that her brother was drunk in the house, and had beaten her and his mother, and was otherwise creating a disturbance, and her mother wanted him arrested. Captain Hopkins sent the plaintiff's intestate and officer Doherty together to go there and take other officers with them from their beat as they went on their way. The place was some three or four hundred yards from the station, and on another street. It was about ten o'clock in the evening, and a very dark and rainy night, with no moon. They took no lantern. There was no light from any windows on the premises or otherwise, and none on the street opposite

thereto. Booth and Doherty found officers Thomas and Little-
john on their way, and took them with them. They went
through the passageway from the street into Mrs. King's tene-
ment and found King, who was a young man, drunk, swearing,
and making loud noises. Mrs. King requested them to take him
away. He refused to go with any one but Booth. Booth took
him by the left arm, and went out of the house with him, Doherty
leading the way a few feet ahead of him, and officers Thomas
and Littlejohn following a few feet behind Booth. They passed
on towards the passageway. When Doherty had got past the
well, they heard Booth exclaim, " Oh ! " and. they found that he
had stepped with his left foot into the opening of the well, and
lay with his left side on the board covering. They extricated
him, and then proceeded, with their prisoner still in Booth's
charge, to the station, from which Booth was carried home suf-
fering great pain from his injuries. Officers Littlejohn, Do-
herty, and Thomas testified that they had before then been on
the premises frequently, and knew the condition of the well.

A. B. Hodges, city marshal, testified that he went there the
next morning, and found that the top board on the northerly side
was loose; that he had noticed the well many times, and it had
been in the same condition for at least one year before.

Carrie Babbitt testified that she lived on the opposite side of
the street, and that the well had been in that condition for at
least two years before the accident; that the tenants lowered a
bucket or a pail by a rope and drew up the water.

Joseph F. Etter testified that he worked on these premises in
the summer of 1881, fixing some leaks in the buildings, and did
a little shingling; that he noticed the well; that he asked the
defendant if he wanted him to make a new curb on the well,
and he answered, " No ; " that the witness said, " Somebody
may get drowned," and he answered, " Let them drown."

The defendant, in addition to what has before been stated,
testified that his residence was, and had been for many years,
including the time of the accident, at Lakeville, in Plymouth
county, about eight miles from the premises; that he had visited
the premises about once a month since 1877; that he did not
visit them until then, from the time of giving the lease; that up
to the time of the accident he had done nothing to the well, and

had given no directions in regard to it; that it was for the use of all the tenants.

It appeared by the evidence, that, at the time of giving the lease, there were no other buildings on the premises except the two front southerly buildings described; and the open lot in their rear and that on the north side were used as an open back yard and garden.

The defendant requested the judge to rule that, upon the whole evidence, with all the inferences that might be drawn from it, the plaintiff was not entitled to recover; and that a verdict should be returned for the defendant. The judge refused so to rule.

The defendant also requested the judge to instruct the jury, among other things, that, as matter of law, the legal title as lessees remained in the assignees of Thomas O. Falvey, and, by the terms of that lease, the defendant had no legal right to occupy or control the premises or collect the rents; that it could be done only by their consent; that the rights of these assignees were paramount to his, so far as letting, occupying, and controlling the premises are concerned; and that merely letting the premises and collecting the rents imposed no liability on him, so far as defective passageways are concerned. Upon the above points, the judge said to the jury, "I understand that these propositions are all true, as matter of law; but if you find that, at the time this accident occurred, the defendant had the actual management or control, that is, was the party actually using the premises, and managing and controlling them, as a landlord, he would still be liable as such landlord for defective passageways."

The jury were also instructed, that, in order to recover, the plaintiff must establish from the evidence these five propositions, and the principles of law applicable to them were stated in a manner not excepted to:

1. That at the time of the accident the defendant was the party managing and controlling on his own account (by letting them to tenants or otherwise) the premises of which the passageway was a part.

2. That in such management he did not let to any tenant, or to all the tenants jointly, the well and the adjacent land, but

retained the possession and control of it, giving each tenant no greater right than the privilege of using it in common with the others.

3. That he negligently suffered it to be.in a condition unsafe and improper for those who, by his invitation, express or implied, used the passageway for access to the houses in the rear.

4. That at the time of the accident the plaintiff's intestate was by such invitation so using the passageway.

5. That he was in the exercise of due care.

The defendant then requested that the following instructions be given to the jury : " If the rear building or tenement, where the arrest was made, was placed there by a party holding under said lease, and before then there was nothing but an empty back yard with no building thereon westerly of and beyond the well, then the invitation to or creation of the right to the public, if any, to enter westerly and beyond the well, was the act of the lessees, and there was no obligation on the defendant to provide the passageways thereto, or ·to provide against defects in such passageways. Upon the evidence as to the use of these premises and their situation, a smooth and convenient passageway, unobstructed, eleven feet wide, extending southerly from the well to the northerly line of the southerly building, was, as matter of law, good and sufficient, and the defendant would not be liable to a person who was injured by falling into an excavation outside thereof. Considering the circumstances of time, place, and the darkness, the testimony of the plaintiff's intestate shows that he was not in the exercise of due care. It did not appear that he was there for a lawful purpose. The arrest was unlawful, and he was not lawfully there. Neither the owner nor occupants of the premises were bound to keep the well covered, as against a person entering and leaving for the purposes testified to." The judge refused to give these instructions.

The jury returned a verdict for the plaintiff ; and the defendant alleged exceptions.

*J. Brown*, (*J. Godfrey* with him,) for the defendant.

*W. H. Fox & A. M. Alger*, for the plaintiff.

HOLMES, J. The jury were warranted in finding that the defendant was seised of the premises, and in possession and control of that part of them where the accident happened. It

appeared from the defendant's own testimony that he was actually the landlord, and had collected the rents since 1877. *Daintry* v. *Brocklehurst*, 3 Exch. 207. He spoke of having got possession, that is, as we understand it, of the whole premises; and there was evidence that he assumed to have control over the well into which the plaintiff's intestate fell. There was also evidence that the sub-lessees of the premises had surrendered to the defendant's lessee before the latter surrendered to the defendant. *Amory* v. *Kannoffsky*, 117 Mass. 351, and cases cited. If there was any technical defect in the surrender of the sub-lessees, the mere fact that there was a formal and unasserted right outstanding would not prevent the defendant's being chargeable to the same extent as if there had been no flaw in his right of possession.

It does not appear distinctly whether the defendant himself had let the tenement from which the plaintiff's intestate was coming at the time of the accident, but it seems probable that it was held at will, so that the case is not complicated by the question whether the landlord's liability would be diminished by reason of that tenement being subject to a lease when the premises came into his hands. No such question was argued, and we assume that the defendant let the tenement when the premises were in their present condition, and therefore stands in the same position toward the public as if he himself had put the premises in that condition before the lease.

The plaintiff's intestate went to the tenement referred to, to stop a disturbance of the peace which was taking place there, as he had a right to. Gen. Sts. *c.* 23, § 2. Pub. Sts. *c.* 34, § 2. He seems also to have been invited by the occupant, whose son was making the trouble. He arrested the son, but as the arrest does not appear to have affected his course in leaving the place, his right to recover would not be affected if the arrest were unlawful. He came on the premises lawfully, and could lawfully leave them.

Under the instruction of the court, the jury must have found that the intestate was using the passageway by the defendant's invitation. That is to say, that the intestate had a right to understand from the appearance of the premises that the intended mode of approach to the tenement in question was over the open

space where the well was; and the evidence warranted the finding to that extent.

Now supposing there had been a wrought avenue, and the accident had happened within it, as the avenue would have held out exactly as great an invitation to the public having lawful occasion to visit the tenement when some one else lived there as if the defendant himself had done so, the defendant would have been liable for any neglect to take proper precautions to make the avenue reasonably safe. *Larue* v. *Farren Hotel Co.* 116 Mass. 67. *Sweeny* v. *Old Colony & Newport Railroad*, 10 Allen, 368.

But the principle of the case last supposed does not depend upon the way being wrought. If the appearance of the premises is such as to point out a certain open space as the mode of approach, while it may not be the defendant's duty to take care of the whole open space as an approach, his duty to keep safe the approach offered, whatever it is, is as great as if it were a wrought avenue. And although the jury should regard less than the whole space as the approach proper, yet they would be at liberty to find, from the absence of any marks defining and separating the approach proper from the rest of the space, that an exceptional danger outside the former and in the latter made the approach itself unreasonably dangerous. See *Barnes* v. *Chicopee*, ante, 67, and cases cited; *White* v. *France*, 2 C. P. D. 308. To put it in another way, the jury had a right to find that the plaintiff was properly where he was. *Gilbert* v. *Nagle*, 118 Mass. 278.

The defendant argues that the plaintiff was not using due care, because, coming to an obstacle fifteen inches high, in the dark, and stepping upon it, he then stepped forward, and so fell into the well. The jury, who regarded the well as making the passage dangerous, may have considered that the plaintiff had a right to assume that no such danger would be allowed to beset the way. We cannot say, as matter of law, that they were wrong. *Severy* v. *Nickerson*, 120 Mass. 306, 307. *Fox* v. *Sackett*, 10 Allen, 535, 536. *Lawless* v. *Connecticut River Railroad*, 136 Mass. 1, 6.

This disposes of all the questions argued before us, and of all the exceptions which were not waived. *Exceptions overruled.*