[No. 5924.]

## LUNT v. THE POST PRINTING AND PUBLISHING COMPANY.

1. .Pleadings—Construction—The complaint alleged that defendant kept in its etching room a quantity of nitric acid; that the package being broken· by defendant's negligence, the acid escaped in noxious fumes, apparently smoke; that defendant thereupon caused an alarm of fire to. be turned in, and so invited the fire department and its members to the premises; that plaintiff's ·husband, as a member of the fire. department, responded to the ·call and believing that a fire existed in defendant's etching room, "from which large volumes of supposed smoke were issuing," and being ignorant of the danger, sought the supposed fire, and while so engaged inhaled the fumes of the acid, and therefrom came to .his death.. Negligence was charged (1), in sending an alarm of fire when there was no fire, (2), in keeping in the etching room a large carboy of nitric acid knowing the danger thereof, (3), in negligently so opening the carboy that the same was broken, and the acid liberated, (4), and in failing to notify the deceased of the deadly nature of the acid fumes though with full knowledge on the part of said defendant, "actual or implied"; held, that there being no averment that the carboy of acid was wrongfully or unnecessarily kept in the etching room, or in unreasonable quantity, it would be presumed that the acid was lawfully and rightfully kept, and in reasonable quantity, that it was not inherently dangerous, so that the complaint failed to show an actionable nuisance (321); that the defendant's servants believed that the "supposed smoke" was in truth smoke, indicating fire, and gave the alarm in good faith, and that the defendant itself entertained the same· belief; that in so doing defendants were acting lawfully, and were not required to investigate further the cause of the alarming appearance (328); that the allegation that the defendants had knowledge, "actual or implied," of the deadly nature of the acid fumes is to be taken as importing implied and not actual knowledge (332, 333); that defendant owed to the fireman no duty to inform itself as to this, and therefore the averments of the complaint were not to be taken as charging recklessness, willfulness, wantonness, or lack of reasonable care.—(335)

2. Invitation—An alarm of fire by the owner of a building is not an invitation to the fire department to enter his premises; the members of that body responding to the call perform a duty which they owe to the public, whether the call emanate from

the owner or a stranger; that the duty is the same though the owner oppose their entrance; that they enter the premises as mere licensees, and the land owner is liable for an injury occasioned to one of them, ~~~~ ~~~~—(324-327)

*Error to Denver District Court*—Hon. PETER L. PALMER, Judge.

Messrs. RICHARDSON & HAWKINS, Mr. STEPHEN W. RYAN, for plaintiff in error.

Messrs. WALDRON & THOMPSON, and Mr. JOHN T. BOTTOM, for defendant in error.

Mr. JUSTICE MUSSER delivered the opinion of the court:

In this action there was a demurrer to the complaint on the ground that the complaint did not state facts sufficient to constitute a cause of action against the defendant. The demurrer was sustained. The plaintiff elected to stand upon the complaint, whereupon the complaint was dismissed and judgment was rendered in favor of the defendant for costs. From this judgment the plaintiff brought the action here on error, assigning as error the action of the court in sustaining the demurrer to the complaint, dismissing the same and rendering the judgment in favor of the defendant.

The complaint first alleges the corporate capacity of the defendant; that Frank P. Lunt was the husband of the plaintiff and a member of the fire department of the city and county of Denver and acting in that capacity on the 20th day of September, 1904; that the defendant was occupying a portion of the building, particularly a room in the second story thereof, known as an etching room, near the corner of Sixteenth and Curtis streets in the city of Denver. The complaint then proceeds as follows:

"Fourth: That at or about 3:30 o'clock in the afternoon of said day, the defendant company caused an alarm of fire to be turned in from the fire box at the corner of Sixteenth and Curtis Streets, and thereby invited the fire department of the City and County of Denver, and its members, including the said Frank P. Lunt, to come to, upon and in the premises so occupied by the said defendant as aforesaid, as an etching room, for the supposed purpose of putting out the fire therein.

"Fifth: That in pursuance to said invitation and in obedience to and in conformity with his duties as a member of the fire department of said City and County of Denver, said Frank P. Lunt did forthwith proceed to said etching room, at the place aforesaid, so occupied as aforesaid, from which said room large volumes of supposed smoke were issuing.

"Sixth: That there was no fire upon or in said premises, but the said supposed smoke was caused by the liberation of a large amount of nitric acid, then and there kept in the said etching room by the defendant company.

"Seventh: That the said Frank P. Lunt, supposing and believing that a fire existed in the said etching room, did enter the same in his capacity as a member of the fire department, and did seek for and attempt to put out the supposed fire therein contained, without any knowledge on his part of any dangers of any kind or character, other than those which were usually incident to his calling as a fireman in places where fire would be actually raging.

"Eighth: That while he was so engaged as aforesaid, he did breathe the said supposed smoke so described as aforesaid, as it was necessary for him to do, in order to remain in the said room and assist in putting out the supposed fire therein contained.

"Ninth: That by reason of the said breathing, his eyes, mouth, throat, lungs and stomach were filled with the said supposed smoke, repeatedly.

"Tenth: 'That the said supposed smoke was not in reality smoke at all, but consisted of fumes and vapors from the said nitric acid so liberated as aforesaid, in the etching room, all of which fumes and vapors were a deadly poison inimical to human health and life, and disastrous in the highest degree to the mucous membranes and lung tissues of the human body; of all of which the said Frank P. Lunt was wholly and absolutely ignorant at the time mentioned."

The complaint then proceeds and alleges that within an hour after the said Lunt entered the said room, he was seized with a deadly nausea and paroxysms of vomiting, and within twenty-four hours he became afflicted with a violent case of traumatic pneumonia, and continued ill until the 12th day of October, when he died, and that his death was caused by the injuries which he had received from breathing the fumes.

The complaint then further proceeds as follows:

"Fourteenth: That the said injuries were brought about solely by reason of the negligence of the defendant company, and without fault or negligence upon the part of the said Frank P. Lunt; and the said negligence consisted in each and every of the following particulars, to wit:

"a. The defendant company negligently invited the said Frank P. Lunt onto its premises, by sending in or causing to be sent in, a general alarm of fire, when in truth and in fact there was no fire in or upon the said premises.

"b. The defendant company kept and maintained a large carboy of nitric acid, containing several gallons, in the said room, well knowing that the

same was exceedingly dangerous, and further knowing that if anything should cause the carboy to become cracked, which contained said nitric acid, that the said nitric acid would then escape, no matter how slight the crack might be in the first instance.

"c. In negligently and improperly so opening or attempting to open the said carboy of nitric acid that the same would be liable at any time to become, and the same did become, cracked and the acid therein contained thereby became liberated, to the danger of those who might be called upon to enter the said room.

"d. In failing to give the said Frank P. Lunt any warning of any kind or character, of the deadly nature of the said nitric acid when liberated.

"e. In failing to warn the said Frank P. Lunt, or cause him to be warned, that the fumes and vapors of the said nitric acid, if breathed into the human body, would destroy the mucous membranes and tissues and result in the sickness and probably the death of any one who breathed any considerable quantity of such fumes and vapors, with full knowledge upon the part of the said company, either actual or implied, of the deadly nature of such fumes and vapors."

The complaint then concludes with the allegation that the plaintiff is the widow of said Frank P. Lunt, and that by reason of the said negligence of the defendant, plaintiff was damaged in the sum of $5,000.00, and prays judgment for that amount. It appears from the complaint, nothing being alleged to the contrary, and the statutes of the state requiring that the name of a corporation shall indicate its business, that the defendant was engaged in the printing and publishing business. It is alleged that the room in which the deceased was injured was known as an etching room and occupied by the defendant. It is

nowhere alleged in the complaint, directly or by implication, that the nitric acid was unlawfully, wrongfully or unnecessarily in that room. It is alleged that there were several gallons of the acid in the carboy. The word "several" means "more than two, but not very many."—Webster's International Dictionary. From this it appears that there were at least three gallons, and in any event, not very many. It is not alleged that there was an unreasonable quantity of the acid, and without such an allegation, that fact cannot be presumed. Unless conditions, that are not alleged in the complaint to have existed, be presumed, the acid, for aught that appears in the complaint, was lawfully and rightfully present in the carboy in a reasonable quantity and in proper form for legitimate use by the defendant in the etching department of its business of printing and publishing, and that it was not inherently dangerous to the public, nor to occupants of adjacent premises. These observations at once remove the question of actionable nuisance from the field of discussion, and the action appears, as is directly alleged, to be an action based solely on negligence.

It is apparent from the complaint that an endeavor is therein made to state a cause of action that would be within the rule announced in many authorities, and which is well stated in *Bennett v. Railroad Co.*, 102 U. S. 577-580, as follows:

"The owner or occupant of land who, by invitation, express or implied, induces or leads others to come upon his premises, for any lawful purpose, is liable in damages to such persons—they using due care—for injuries occasioned by the unsafe condition of the land or its approaches, if such condition was known to him and not to them, and was negligently suffered to exist, without timely notice to the public,

(21)

or others who were likely to act upon such invitation."

The various other rules of law are referred to in plaintiff's brief, and attempts made to apply them to this complaint, it is apparent from the complaint that the position of plaintiff may be stated briefly to be: That the defendant, by turning in an alarm of fire, thereby extended an invitation to the deceased and by such invitation induced, or led, or lured the deceased to come upon the premises, to wit, the etching room, for a lawful purpose, to wit, to put out the supposed fire, and that the defendant is liable in damages for the injury inflicted by the unsafe condition of the premises, to wit, the presence thereon of the poisonous fumes, which condition was known, or ought to have been known to the defendant and was not known to the deceased, and was negligently suffered to exist without timely notice to the deceased, who acted upon such invitation. It must be admitted that if the complaint brings the cause of action, sought to be alleged, within the rule announced above, then the complaint is good, and it must be confessed that from a mere cursory reading of the complaint one is inclined to believe that the alleged cause of action falls within the rule. However, from an analysis of the rule and the allegations of the complaint, in the light of the authorities, it appears that the complaint does not state a cause of action within the rule. It will be noticed that the rule itself, as announced in the case of *Bennett v. Railroad Co., supra,* and in other cases cited by plaintiff (*Atlanta Cotton Seed Oil Mills v. Coffey,* 80 Ga. 145; *Beck v. Carter,* 68 N. Y. 283; *Lowe v. Salt Lake City,* 13 Utah 91; *Learoyd v. Godfrey,* 138 Mass. 315; *Beehler v. Daniels,* 18 R. I. 563; *Hart v. Cole,* 156 Mass. 475), bases the question of recovery primarily upon the fact that an invitation, express or implied, was given

to the injured party, by which invitation he was induced, or led, or lured, or enticed by the defendant upon the premises, where the injury occurred. Was the deceased induced, or led, or lured, or enticed into that etching room by any invitation, express or implied, of the defendant? In the fourth paragraph of the complaint it is alleged that the defendant caused an alarm of fire to be turned in from a fire box and thereby invited the fire department, including the deceased, to come into the etching room, for the purpose of putting out the supposed fire therein. In subdivision a of the fourteenth paragraph, it is alleged that the defendant negligently invited the deceased onto its premises by sending in, or causing to be sent in, a general alarm of fire. While the pleader uses the word "invite" in the complaint, it is clear that this is but a conclusion of the pleader from the fact that the company turned in an alarm of fire.—*Schoepflin v. Coffey,* 162 N. Y. 12 at 16. So that whether or not the deceased was upon the premises by invitation of the defendant, depends, not upon any direct allegation of the complaint, but upon whether or not the turning in of a general fire alarm, or of any fire alarm, by the owner of premises, when indications of fire are present, constitutes an invitation for the fire department to come upon the premises and be there in the status of invited persons within the rule announced. What is the status of a fireman on premises in the discharge of his duty? In 2 Cooley on Torts (3d ed.), page 648, the learned writer says:

"The third class of licenses comprehends those cases in which the law gives permission to enter a man's premises. This permission has no necessary connection with the owner's interest, and is always given on public grounds. An instance is where a fire breaks out in a city. Here the public authorities,

and even private individuals, may enter upon adjacent premises as they may find it necessary or convenient in their efforts to extinguish or to arrest the spread of the flames. The law of overruling necessity licenses this, and will not suffer the owner of a lot to stand at its borders and exclude those who would use his premises as vantage ground in staying the conflagration.''

On page 1268 it is said:

''Firemen who enter a building in case of fire are licensees merely and the owner or occupant is not liable for their injury by reason of any defects or unguarded pitfalls, or other dangers.''

That a fireman who enters on premises in the discharge of his duty is a licensee, is also held in *Gibson v. Leonard,* 143 Ill. 182; *Woodruff v. Bowen,* 136 Ind. 431; *Eckes v. Stetler,* 90 N. Y. Supp. 473; *Beehler v. Daniels,* 18 R. I. 563; *New Omaha T. H: E. L. Co. v. Anderson,* 73 Neb. 84; 2 Shearman & Redfield on Negligence (5th ed.), § 705.

If firemen are licensees, as these authorities say, then firemen are not invited persons, as the word ''invited'' is used in the rule announced in *Bennett v. Railroad Co.* In all instances the firemen respond to a notice, call or alarm of some nature, either by or from the occupant of premises, his servants, or another. This alarm apprises the firemen of the existence and location of conditions indicating fire, and the law, when such conditions exist, creates their right and imposes upon them the public duty to enter upon the premises. The right to enter exists before the alarm is sounded, and indeed exists without an alarm if the conditions are present. The right thus created extends not only to the particular premises upon which the conditions exist, but to adjacent premises, which, in the opinion of the firemen, it may be necessary to enter in order to facilitate the dis-

charge of their duty. When the right to enter is dependent upon an invitation, it is the invitation, express or implied, that creates the right to enter, and without the invitation the right does not exist. Hence as an alarm does not create the right to enter, and the right exists independent of the alarm, it cannot be an invitation. It is true the complaint alleges that the defendant turned in the alarm, or caused it to be turned in. In such a case, as in any other, the right of the firemen to enter, when conditions indicating fire are present, exists before the alarm. How then can the sounding of the alarm, in such a case, create the right to enter any more than though the alarm was given by a stranger to the premises? When the alarm of fire is given, the department responds as readily when it is given by a stranger as by the occupant of the premises, and the powers and duties of the fire department are the same whoever may send in the alarm. Indeed the occupant of the premises may object to the sending in of the alarm, yet it may be sent in over his objections. The occupant may stand at the boundary of his premises and forbid the entrance of firemen thereon, and he may attempt to keep the firemen therefrom, yet the firemen may brush him aside and with impunity enter the premises over his protests, in discharge of their duty. So that the occupant has no more to do with permitting the firemen to enter than any other of the public. The firemen are on the premises, not in discharge of any private duty due from them to the occupant, but of a public duty which they owe to the public. Indeed it may be said, that in populous cities the firemen are more concerned to keep a fire confined to the one premises and to prevent its spreading into a general conflagration, than they are in the preservation of the property of the occupant, although the latter also concerns them. The alarms

are but a part of the general system of a fire depart-
ment, designed to apprise the department of the
existence and location of conditions indicating a fire.
The general system of the department is one of
service to the public and the turning in of the alarm is
but a detail in this public service. The occupant of
premises, observing a condition indicating fire there-
in, owes it to the public to turn in an alarm, and a
stranger to the premises, observing a like condition,
owes it to the public to turn in an alarm. In either
event the occupant or the stranger performs the same
public service. Of course the occupant, in addition
to performing a public service, likewise performs a
personal one, but this difference cannot make the
right of the firemen to enter dependent on the will or
act of the occupant, when that right already exists
by force of law.

In the case of *Baker v. Otis Elevator Co.,* 79
N. Y. Supp. 663, it appears that an alarm was sent
in from the special fire box of the defendant, but that
fact did not change the relation of the firemen.

In the case of *Woodruff v. Bowen, supra,* the
complaint alleged that the defendant, "as a resident
of the city, and as a constituent part of this govern-
ment, and as entitled to the protection of the fire
department, invited the decedent and his comrades,
in their capacity as firemen, into and onto the build-
ing." And with respect to this allegation the court
said:

"The pleader evidently intended, we think, to
charge that there existed a general implied invitation
from the citizens of the city, including the appellee,
to the firemen belonging to the fire department to
enter their houses in case of a conflagration, for the
purpose of extinguishing the fire."

The court, notwithstanding the allegation of the

complaint, held on demurrer that the fireman was on the premises as a licensee, and not by invitation.

The case of *Beehler v. Daniels* reached the supreme court a second time and is again reported in 19 R. I. 49. Speaking with regard to averments of an invitation in the complaint, the court said:

"The fourth count seeks to state a case of legal liability by averring an invitation to the plaintiff to enter the premises in question; but, as it is an implied invitation, the declaration, accurately drawn, sets out the facts as stated above, from which the invitation is to be implied. The idea is that the plaintiff is in the employ of the taxpayers collectively and so of the defendants individually; that the relation sustains the invitation and that he is thus invited to enter the premises of his employers in the discharge of his duty. This presents the same question which we considered in our former opinion, the only difference being that now the invitation is averred which was then claimed to be implied from the facts, and there is also now added the fact that the defendants are taxpayers in Providence. The question, however, is the same and the answer must be the same, that the facts do not amount to an invitation. There is no relation between a fireman and a taxpayer to raise it. There is no individual employment nor responsibility in respect to public officers or servants on the part of taxpayers and so no basis for an implication of service and invitation. Of course firemen have a right to enter premises to stop a fire, but it is under the same law which allows others to enter, called by Judge Cooley, 'the law of overruling necessity.'"

The inevitable conclusion is, that the turning in of the alarm by the defendant was not an invitation to enter the premises. The pleader seemingly endeavored to overcome this by alleging that the alarm

was turned in "when in truth and in fact there was
no fire in or upon the said premises." It will be
noticed that nowhere in the complaint is it alleged
that the defendant or its servants knew there was no
fire in or upon the premises. The complaint alleges
that large volumes of supposed smoke were issuing
from the etching room, and that there was a supposed
fire in the room. The word "smoke" in the com-
plaint and in this opinion is used as it is ordinarily
understood. The firemen supposed it was smoke and
it must be taken from the complaint, as nothing ap-
pears therein to the contrary, that the servants of the
defendant, in good faith, also supposed it was smoke.
If there were great volumes of supposed smoke pres-
ent, the servants of defendant were certainly justified
in believing with the old saying that, "where there
is so much smoke there must be some fire," even
though that fire was occasioned by some unknown
chemical action of the acid. If the supposed fire
was occasioned by the acid, or something else, it
called for investigation and action by the fire depart-
ment, so that if fire was present, not only should the
property of the defendant be saved, if possible, but
what was of more importance to the public, a general
conflagration be prevented. Unless the contrary be
assumed to have existed, it must be concluded that
the servants of the defendant, in good faith, believed
and had the right to believe that there was a fire, and
in such a case they ought to turn in an alarm, or cause
it to be turned in. It would not be a salutary rule
to announce that a person, be he the occupant or a
stranger, is bound, at his peril, to know that a fire in
truth and in fact exists, when all indications point
that way, before he turns in the alarm. In cities
especially, every equipment of a fire department is
chosen and every act thereof is done to the end that
every minute shall be utilized in order that the

shortest possible time shall intervene between the breaking out of a fire and the arrival of the firemen. Oft times a few minutes will put a fire beyond easy control and convert it into a general conflagration. It is best, therefore, that a person be permitted to act quickly upon indications presented to him and not lose what might be precious minutes in investigating, so as to be absolutely sure that a fire exists. Certainly when great volumes of supposed smoke issue out of a room, any person is justified in believing that a fire exists, whether occasioned by nitric acid, or otherwise, and is justified in acting upon that belief, and in turning in an alarm of fire without losing more time in investigation. It is therefore concluded that the servants of the defendant, in good faith, believed that a fire existed in that etching room and that under these circumstances they turned in an alarm of fire, as they ought to have done, and that the alarm so turned in was not an invitation in the sense of the rule announced in *Bennett v. Railroad Co.*, and that the deceased came upon the premises in the character of a licensee, under circumstances and conditions requiring his presence in the discharge of his duties.

In the case of *Watson v. The M. & P. P. Ry. Co.*, 41 Colo. 139, this court said, that it was not the duty of a licensor to give a licensee notice of hidden dangers. No doubt the court in that case wished to limit the language used to cases where the failure to give such notice would not amount to willfulness or wantoness, for the court quotes with apparent approval from sec. 1251, Elliott on Railroads, as follows:

"We have endeavored to show in the preceding section that there is, ordinarily, no duty to a licensee except to refrain from willful or wanton injury to him and to use reasonable care to prevent injury to him after discovering his danger. If there

is no duty to the plaintiff or no violation of such duty there is, of course, no liability.''

While some of the authorities use stronger language in their expression of the rule than Mr. Elliott, the quotation from that author, for the purposes of this case, very well expresses the general conclusion of the authorities with regard to the duties which the owner of premises owes to a licensee thereon, and this rule is applied to firemen.

In the case of *Hamilton v. The Minneapolis Desk Mfg. Co.*, 78 Minn. 3, the plaintiff was a member of the fire department at Minneapolis and he entered a building in the discharge of his duty, in response to a call, and while engaged in extinguishing the fire he fell through an unguarded elevator shaft and was injured. The court said:

''By the rules of the common law, a fireman going upon the premises of another, under the circumstances appearing in this record, could not recover damages for such an injury. However hard such a rule may seem, it appears to be settled that the owner or occupant of a building owed no duty to keep it in a reasonably safe condition for members of a public fire department who might, in the exercise of their duties, have occasion to enter the building.''

In that case it also appears that there was a statute of Minnesota requiring that elevators be guarded, but the court held that it appeared from the act that it was intended to protect employees, and imposed no duty to firemen.

The cases cited above from Illinois, Indiana, New York, Rhode Island and Nebraska, all of which deal with injuries sustained by firemen while in the discharge of their duties, are to the same effect. It is not necessary in this case to go to the length of some of these authorities, but they fully sustain the

doctrine as announced by Judge Elliott in his work on railroads, and apply it to firemen.

In the case of *Woodruff v. Bówen, supra,* determined on demurrer to the complaint, it appeared that on account of the weakness and insecurity of the walls and foundations of a building the roof fell in during a fire and precipitated the deceased and eleven other firemen into the basement, killing them. The defendant knew of the insecure and dangerous condition of the wall, while the firemen did not. There was also an ordinance of the city of Indianapolis declaring it to be unlawful for any person to construct or maintain any unsafe, insecure and dangerous wall or building within the city limits. To illustrate how strongly some courts express their ideas of the law, in evolving an application of it to firemen, the following quotation is taken from that case on page 441:

"In the case of *Reardon v. Thompson,* 149 Mass. 267, it was said: 'No doubt a bare licensee has some rights. The landowner cannot shoot him.' He cannot lawfully set spring traps for him. The licenser is liable, even to a licensee, if he is guilty of what the civil law termed '*dolus.*' But beyond this the licenser owes the licensee no duty, certainly not the duty of active diligence to see that no harm comes to him, and when the latter, without any invitation, and pursuant to a mere license, enters the former's premises, he takes the risk of whatever dangers may be there. The law is so laid down in the text-books, and is established by a multitude of decisions."

And on pages 442 and 443 the court said:

"We are of the opinion that the owner of a building in a populous city does not owe it as a duty at common law, independent of any statute or ordinance, to keep such building safe for firemen or other officers, who, in a contingency, may enter the same under a license conferred by law."

The court further held that the ordinance did not apply to firemen in case of a fire, nor to the kind of a wall described in the complaint. The cracking of the carboy containing the acid, if caused by the negligence of the defendant, happened before the firemen were on the premises, and such negligence was not a breach of a duty which the defendant owed to the firemen, and the act which occasioned the cracking of the carboy, even if it was negligence on the part of the defendant or its servants, cannot reasonably be characterized as reckless, willful or wanton.

The authorities, in announcing the rule of non-liability to firemen, do not consider the origin of the fire at all. They announce the law, regardless of whether the fire was started by the negligence of the occupant or not. Some fires originate without the intervention of human negligence. Nearly all fires originate through somebody's negligence, and as in the nature of things, the occupant or his servants have more to do with the premises than anyone else, it is fair to conclude that the majority of fires are caused by the negligence in some way, of the occupant or his servants, yet the authorities do not mention this element of negligence in considering the liability of the occupant for injury to a fireman.

It is alleged in subdivision e of the fourteenth paragraph of the complaint that the defendant was guilty of negligence in failing to warn the deceased of the direful effect of breathing the fumes and vapors of the nitric acid, "with full knowledge on the part of the said company (defendant), either actual or implied, of the deadly nature of such fumes and vapors." It has been seen that, under the allegations of the complaint, the servants of defendant, in good faith, believed that the vapor in the etching room was smoke, whether such smoke came from fire started by some unknown chemical action of nitric

acid or otherwise. It is not alleged that the defendant or its servants knew that this vapor was the fumes and vapors of nitric acid and not smoke. Does the allegation of the complaint, that the defendant had knowledge, either actual or implied, of the deadly nature of the fumes and vapors, charge the defendant with actual knowledge thereof? Strictly speaking, this is no allegation of knowledge, for it neither says that the one kind nor the other was possessed. This strictness, however, is not to be applied, under the code. The language of the allegation indicates that in the mind of the pleader, it was immaterial whether the defendant actually knew or not, and makes paramount the idea of duty to know, and, therefore, the law raises an implication of knowledge. The intent and sense, therefore, to be drawn from the allegation is that the defendant ought to have known.

In *O'Keefe v. National F. B. & P. Co.*, 66 Conn. 38, the complaint alleged that the plaintiff was negligently put to work in placing colored paper, saturated with poison, into a box greatly heated with steam, and then taking it out again, when softened, for more easy folding; that he did not know the paper was poisoned; that the steam and heat of the box caused the poison to exhale and mingle with the steam, which poisoned steam the plaintiff was compelled to breathe, while at work, and that the poison also worked into his body, through the pores of the skin; that the defendant failed to give plaintiff notice of the poisonous nature of the paper, or of the danger that might result to his health from such work. With respect to the knowledge of the defendant, it was alleged that:

"The defendant knew, or ought to have known, the effect and result the placing of colored paper into a box greatly heated by steam, and then taking it

out again, would have, or might have, upon the person employed in such work, to wit, the plaintiff.''

With respect to this allegation, the court said:

''The plaintiff alleges that the defendant knew, or ought to have known, the effect that steaming colored paper in a hot box would or might have on the health of those who conducted the process. This (construed as it must be most strongly against the pleader) amounts simply to a charge that the defendant ought to have known the effect the work might have on those engaged in it.''

Though its language so declares, the court, in fact, did not construe the pleading against the pleader, but gave to the allegation the only intent and meaning it could have.

In *Durell v. Hartwell*, 26 R. I. 125, the plaintiff, while engaged in decorating a building, was knocked from a staging, on which he was standing, by an elevator. The staging projected into the elevator-well. The complaint alleged that the plaintiff was ignorant that the staging projected into the well, but the defendants knew, or by the exercise of due care, could have known, that it so projected, and that they, without warning to the plaintiff, so operated the elevator that it was driven against the staging. Referring to the allegation concerning knowledge, the court said:

''The declaration states that the defendants 'knew, or by the exercise of reasonable care could have known, that a portion of the staging projected into the elevator-well.' This is not an allegation that the defendants knew, but only that they might have known by the exercise of due care.''

These authorities establish that the allegation in the complaint, that the defendant had knowledge, either actual or implied, of the deadly nature of such fumes and vapors, amounts simply to an allegation

that the defendant had implied knowledge of such fact and not actual knowledge. The pleader attempts to impose upon the defendant the duty of exercising due care to acquaint itself with the deadly nature of the fumes and vapors. Under the authorities cited, no such duty to firemen is imposed, and it is not even made to appear that defendant knew that the vapor was the fumes and vapors of nitric acid and not smoke. It follows, therefore, that there is not presented for determination the question whether or not the failure to apprise the deceased of the deadly nature of the fumes and vapors, when that fact was actually known to the defendant, was such recklessness, willfulness, wantoness or lack of reasonable care to prevent injury to the deceased who was on the premises, as to subject the defendant to liability for the injury. A failure to communicate such knowledge, when it was not actually possessed by the defendant or its servants, as appears from the complaint, is not such recklessness, willfulness, wantoness or lack of reasonable care to prevent injury to the deceased on the premises, as to render the defendant liable. No intimation is intended to be given as to what facts would indicate recklessness, willfulness or wantoness. The facts present do not indicate such.

It is alleged in subdivision b of the fourteenth paragraph that the defendant knew that the nitric acid was exceedingly dangerous, but in what particulars it was dangerous is not stated. That allegation is qualified as to the danger arising from breathing the fumes and vapors, and as to that danger the knowledge is not actual but implied.

On behalf of the plaintiff, it is urged that the case of *Cameron v. Kenyon-Connell Com. Co.,* 22 Mont. 312, announces the law applicable to this case. In that case the defendant company kept in its ware-

house, within the corporate limits of the city of Butte, a large amount of Hercules powder; that there was a law of the state of Montana forbidding the storing of such powder within the corporate limits of a city in excess of fifty pounds. It was shown that an amount of powder greatly in excess of that permitted by statute was stored in the warehouse; that the warehouse took fire; that 'the firemen responded to an alarm and while they were at the warehouse, actually engaged in endeavoring to put out the fire, the powder exploded and many persons were killed, including the plaintiff's intestate, who was the chief of the fire department. The court, after stating the facts and discussing the relation of directors to a corporation, says:

"Now, bearing in mind that this case presents itself upon a motion for nonsuit and that we must accordingly consider as true everything which the evidence tended to prove on the trial, we have before us a corporation guilty of a nuisance, by having kept in a frame warehouse within the limits of an incorporated city, in the vicinity of railroad depots and other buildings, an amount of Hercules powder in excess of the quantity—50 pounds—allowed to be stored therein by the laws of the State."

And further on the court says:

"The corporation, therefore, by maintaining this nuisance, became the subject of indictment for misdemeanor, as well as liable in civil action for injury to person or property caused by the nuisance; * * * These propositions are too plain for extended comment. They demonstrate a liability to this plaintiff—assuming always the evidence is uncontradicted."

No further comment is necessary to show that in that case the company was held liable because the

injury was occasioned by a nuisance maintained contrary to the laws of the state of Montana. Under the circumstances present in that case, if it had been necessary, no quarrel could have been had with the court, if it had held that the company was guilty of maintaining a common-law nuisance, or that the company was guilty of such reckless, willful and wanton conduct as to render it liable to any person injured upon or off the premises, either as an invited person, a licensee or a trespasser. There are no such conditions of nuisance or reckless, willful or wanton conduct present in the case at bar, nor any article whose dangerous qualities are so obvious and well understood as the explosiveness of Hercules powder.

The known ability of counsel for plaintiff warrants the assertion that the complaint, upon which it was elected to stand in this case, is as strongly drawn in favor of the plaintiff as the evidence at hand to prove its allegations would permit. Under the authorities, it does not state a cause of action. The rules announced may seem harsh, but they are founded in a public policy for populous districts to which the rights of individuals ought to bend. Fire departments are for the public. The service of its members is purely a public one. It must be so to assure the most effective work in fighting fire. In times of conflagration, or indications thereof, ordinary people lose their power of judgment and are not qualified to direct. Owners of property, whereon are indications of fire, will and should be, for the time, suspended from control, and the trained firemen, as the representatives of the public, be in absolute command, unhampered by the wishes or directions of any individual. Firemen must form their judgment quickly from appearances before them, and they must swiftly execute this judgment if the best

(22)

result be reached. Their time ought not to be spent in determining what duties they owe to this man or that man. Hence, generally speaking, the law is that, in the discharge of their public duties, they owe no duty to individuals. Their business is to put out fires in the best and quickest way. When they have done this, they have performed their duty to the public, to whom alone is any duty due from them. If it be held that duties are due the firemen other than as stated in the quotation from Mr. Elliott's work, this would call for reciprocal duties from the firemen, and thus their work would be hampered and their minds diverted by the consideration of their private duties. The help of a fireman is always needed in times of stress and excitement, when danger surrounds the fireman on every hand, when quick destruction of life and property is threatened, when the necessities of the case call for cool, quick, judgment and swift untrammeled action. It is better that the situation be not further confused by the consideration of reciprocal private duties. The life of the fireman is an heroic one. Daily, in the discharge of his duties, he performs acts of the truest heroism, which go down unheralded and unsung. He consecrates his life to his work, and, when it becomes necessary, unflinchingly offers up, as a sacrifice to the public, his own well-being, his life and the future welfare of his wife and children. The public, to whom he owes this duty and for whom he performs it, owes to him the reciprocal duty of providing generously, in some proper way by public taxation, for the care and comfort of the fireman and those dependent on him, when, in the discharge of his duties, he becomes disabled, and for the care and comfort of his wife and children when he gives up his life for the public.

From what has been said, it appears that the demurrer should have been sustained, and the judgment is, therefore, affirmed.· *Affirmed.*

Chief Justice Steele and Mr. Justice Campbell concur.