### B. B. CHEMICAL CO. v. CATARACT CHEMICAL CO., Inc.
#### No. 249.

Circuit Court of Appeals, Second Circuit.

Aug. 15, 1941.

---

See, also, D.C., 25 F.Supp. 472.

Fish, Richardson & Neave, of Boston, Mass. (Harrison F. Lyman and Charles E. Hammett, Jr., both of Boston, Mass., of counsel), for plaintiff.

Albert R. Henry and D. Rumsey Wheeler, both of Buffalo, N. Y., for defendant-appellant.

Before SWAN, CHASE, and CLARK, Circuit Judges.

CHASE, Circuit Judge.

The plaintiff, the admitted owner, sued the defendant in the District Court for the Western District of New York for infringement of U. S. Patent No. 1,959,321 which was granted May 15, 1934, on the application of Walter H. Wedger, filed December 29, 1931, for a composition and method for its use in securing pieces of stock together. The specifications show that the patent deals with improvements in making and using a softener of dried pyroxylin cement which is of general service and particularly in the attachment of the soles of shoes to the uppers. Without so limiting the scope of the patent, it will be convenient to discuss it simply in relation to such use.

Before Wedger applied for this patent, it was customary to secure shoe soles to their uppers with cement by placing around the edges of a sole and of the upper, after both were prepared for that purpose, a band of pyroxylin cement; allowing it to dry; applying a cement softener just before the sole was to be attached; putting the sole in place on the upper; and then placing upper and sole in a press for a period long enough to allow the cement to set while the parts were held properly in place by the press. This operation required a "dwell" in the press of something like twenty minutes to half an hour and after removal from the press a considerable waiting period was needed before the next operation upon the shoe. This required a comparatively large number of presses for each operator and a correspondingly large amount of factory space. In addition to these disadvantages, some of the softeners in use were either so thin and volatile that they would spread over the cement and evaporate in spots so quickly that there would be "dry joints" in places giving poor attachment of sole to upper or the softeners, if thick enough to avoid such defects, would often contain so great a proportion of solids that this material was apt to be squeezed out in the press and stain the upper leather. If this leather was so colored that such stains could not be removed, as was the case in some instances, the product was permanently damaged.

There is evidence that considerable effort was made, before Wedger's invention without marked success, to produce a more satisfactory softener. Much of it dealt with attempted adaptations of a theory that rather highly volatile solvents might be supplied to fast operators and solvents which did not evaporate so quickly could be used by slower workers or of the principle that heat in the press, or pre-heating the upper, would hasten the setting of the cement; or cooling the softener to retard its evaporation until the sole was put on the upper and the two could be put in the press. None of these expedients, however, accomplished the desired results.

Wedger then hit upon a solution which did away with the difficulties mentioned and resulted in the patent in suit by making a softener whose viscosity prevented unwanted spreading; whose body, nevertheless, contained less than enough solids to cause "squeeze-out"; and whose volatile content was of the low boiling point order which would evaporate quickly.

In so doing he provided a softener which was satisfactory for use with certain machines, mentioned in his specifications, for cementing soles to shoes, and for which applications for patents were pending when he filed his application. It is, however, difficult to determine how much of the apparent success of the use of Wedger's softener with those machines is fairly attributable to the softener itself for that was made of the previously used ingredients and the specifications and claims, as will be seen, are extremely vague.

The softening of pyroxylin, or nitrocellulose, cement could, as was well known, be accomplished by "activating" or "cutting" the dried cement with a thinner solution of the nitrocellulose dissolved in one or more of a number of its solvents such as acetone, ether, ethyl acetate, butyl acetate or the like. Some of these solvents were of the low boiling point, and some of the high boiling point, variety. The lower the boiling point the higher the volatility and vice versa. This was well known and, presumably, any good chemist would obtain the desired volatility by selecting the needed solvent. Another essential in the softener was the right viscosity for otherwise it would not stay where wanted when applied and spreading would have its effect on the rate of evaporation which varies directly with the area of surface exposure. The viscosity of the softener, as was known,

could be increased by increasing the proportion of nitrocellulose to the amount of solvent used at a given temperature and could also be increased by using nitrocellulose of a higher viscosity characteristic. Nitrocellulose, being itself a solid, has no viscosity but compositions of cotton and nitric acid which make nitrocellulose differ according to production methods and have different abilities for imparting viscosity to the resulting solution when dissolved in their solvents. Viscosity is either measured in terms of the centipoise or, not so scientifically, in terms of seconds. The latter is a practical method of measurement which consists of placing the solution in a glass tube one inch in diameter and noting how long in terms of seconds it will take a steel ball of a given size and weight to drop through the solution a distance of ten inches. If the time is ten seconds, for example, the nitrocellulose is called ten seconds nitrocellulose meaning that such nitrocellulose has that viscosity characteristic. There was, therefore, two generally accepted ways to measure, and express accurately, the viscosity with which Wedger dealt in his specifications.

Wedger applied, on Jan. 12, 1931, for a patent for a so-called blanket softener. This application was co-pending with that for the patent in suit and both patents were granted on the same day. This application was mentioned in the specifications of the patent in suit as a softener "for use in cutting pyroxylin cement as well as an improved method of shoemaking based upon reducing the evaporation of a highly volatile softener by the addition thereto of material which raised its viscosity and which apparently while the film of solvent is exposed to the air, forms a skin or 'blanket' which protects the underlying softener from evaporation." The use of that softener reduced the time dwell in the press, but the object of the patent in suit was further improvement, as the specifications show, "by applying to the hardened cement on the sole or shoe and/or shoe bottom a somewhat viscous or plastic softener which, as disclosed herein, comprises a composition containing a relatively small quantity of a suitable cellulose derivative, preferably one which has a high viscosity characteristic, dissolved in a relatively volatile solvent." After stating that the cement could be applied to soles and uppers by using machines such as two patented ones mentioned, Wedger said in his specifications that his softener could be applied "by means of a machine

similar to that shown" in a named patent and then that the shoe parts could "be brought into assembled relation and maintained under pressure conveniently in a cement sole attaching machine such as that shown" in another patent.

He gave as an example of his softener a composition of 40 grams of dry commercial nitrocellulose of a nominal 1100-seconds viscosity, wet with 18cc. of denatured alcohol to make it safe to handle and 900cc. of acetone. This, he said, would produce a softener having a viscosity "within the range of about 1000 to 1500 centipoises." He made it plain that the desired solution should be relatively high in viscosity and low in solid content which in the example was less than 5%. He said that though the viscosity of the solution might be varied somewhat it "should not be brought substantially below that wherein a ribbon of the material will remain in position when placed on dried cement without substantial flowage." And, further, "I find it of no particular advantage to increase the viscosity beyond the point where a ribbon of the material applied to a sole will retain its shape." He recommended acetone as an "exceptionally suitable solvent in this work" and said that "to have the cement set sufficiently within one minute or thereabouts to permit removal of the shoe from the pressure applying machine, I prefer to employ nitrocellulose solvents having a boiling point of 30° to 80° C." The example given in the specifications was by way of illustration only and not a limitation.

The plaintiff charged direct infringement of product claims 1, 2, 6 and 21 and contributory infringement of method claims 19 and 20. Claim 1 is broadly for a softener for dried pyroxylin cement made of either high viscosity nitrocellulose dissolved in a volatile nitrocellulose solvent "to give the softener a plasticity such that it will stay where it is placed on dry pyroxylin cement without substantial flowage but will flow a short distance under pressure applied thereto." Claim 2 is for a high viscosity softener for cutting like cement "comprising a small amount of cellulose ester or ether dissolved in a highly volatile solvent." Claim 6 is for a composition made with nitrocellulose "of a viscosity of at least several hundred seconds" dissolved in a solvent "boiling in the neighborhood of 30 to 80° C." to produce a softener having "a viscosity of above 1000 to 1500 centipoises." Claim 21 is for a composition made with the solvent of claim 6 with enough high viscosity cellulose derivative to make the softener act like that of claim 1. Claim 19 is for improvements in methods of securing together two parts, each of which is coated with a dry cellulose derivative cement, by softening the dry cement on one of the parts with the application of a highly viscous solution of high viscosity cellulose derivative in a low boiling solvent and pressing the parts together. Claim 20 is for a similar process for the same purpose which uses a softener made by dissolving in 10 to 20 parts of a low boiling solvent one part of a cellulose derivative whose viscosity characteristic is high enough to prevent substantial flowage of the softener when not under pressure.

The problem Wedger faced was to provide a softener which would cut the dried cement sufficiently without being so volatile that it would dry before the operator could place the parts in position in the press; of a viscosity that would prevent spreading before pressing; and contain less than enough solids to cause a staining squeeze-out when the press was applied. He accomplished these things and more for he produced a softener which substantially reduced the "dwell" in the press and at a saving in the amount of softener needed per application. As might be expected, his softener has been much used. It had three characteristics which, so far as the proof shows, had never before been combined in a softener for dried pyroxylin cement. They were that its viscosity was substantially higher than other nitrocellulose softeners but lower than ordinary nitrocellulose cements; its nitrocellulose content was lower than that in the usual nitrocellulose cements; and its volatility was relatively high because of the use of low boiling solvents preferably between 30 and 80° C. His example given in the specifications showed specifically one way to make such a softener and that was broadened by permissible variations elsewhere indicated in the specifications.

But it was not enough to avoid dedicating his invention to the public to teach those skilled in the art how to practice it; he was required to state clearly what he claimed to be new in his invention. General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402. To secure a good patent, he had to secure valid claims for they are the meas-

ure of the grant to a patentee. Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721. All the claims in suit were held valid below because it was found that they did sufficiently define what he claimed.

We are, however, unable to agree. The viscosity of the softener of claims 1, 20 and 21 is whatever will cause it to remain, when not under pressure, substantially where placed on dried pyroxylin cement and that of claim 2 is merely "high". Despite the fact that viscosity could be measured and stated accurately in terms of known definite symbols, Wedger described it merely in terms of what the desired viscosity would cause the softener to do. That is insufficient since it would create an unlawful extension of coverage by permitting a patentee to adopt the expedient of describing his product in the terms of function. Holland Furniture Co. v. Perkins Glue Co., 277 U.S. 245, 48 S.Ct. 474, 72 L. Ed. 868. As was said in General Electric Co. v. Wabash Appliance Corp., supra [304 U.S. 364, 58 S.Ct. 903, 82 L.Ed. 1402], "The difficulty of making adequate description may have some bearing on the sufficiency of the description attempted, but it cannot justify a claim describing nothing new except perhaps in functional terms." And unless the word "high" has an accepted meaning in the art or is defined in the specifications, claim 2 is left too vague to be valid. Moreover, claims 1, 19, 20 and 21 also are tied to the term "high viscosity nitrocellulose" or "high viscosity cellulose derivative." The trial court found on somewhat disputed, but clearly sufficient, evidence that the art knew no definite meaning for the expression "high viscosity" as applied to nitrocellulose. We must, therefore, turn to the specifications to find whether Wedger there defined these expressions used in his claims.

The importance of this flows from the statutory requirement of R.S. Sec. 4888, 35 U.S.C.A. § 33, that a patent application must not only so describe the invention or discovery that one skilled in the art may learn how to practice it but "shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery." And this has been emphasized within the last few years in General Electric Co. v. Wabash Appliance Corp., supra, as follows: "Patents, whether basic or for improvements, must comply accurately and precisely with the statutory requirement as to claims of invention or discovery. * * * The statute seeks to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights. The inventor must 'inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not.'"

In his example of the use of nitrocellulose of a nominal 1100 seconds viscosity (which was to be a commercial product ranging from about 1000 seconds to about 1200 seconds) Wedger showed something he designated as high viscosity nitrocellulose. In his specifications he said, "In some instances, it may be satisfactory to obtain the desired body of the composition by employing larger quantities of lower viscosity nitrocellulose. Thus, I have made up softening compositions using nitrocellulose of as low as one hundred seconds viscosity with generally satisfactory results, and, indeed, certain of the benefits of my invention may be obtained by employing nitrocelluloses of a still lower viscosity. However, as the nitrocellulose viscosity goes down, the concentration of the nitrocellulose, and hence the solid content, must be increased, with the danger of 'squeezeout' and dirty shoes. As the lower limits of nitrocellulose viscosity are approached the time during which the pressure must be maintained increases." And then he gave the practical limits of viscosity variation, not in meaningful terms of seconds or centipoises which he might have used to have been definitely descriptive, but with reference to holding the softener at the point most advantageous for use by saying, "While the viscosity of the nitrocellulose content of the softening composition may be varied somewhat, as indicated in the preceding paragraph, the viscosity of the composition under existing conditions preferably should not be brought substantially below that wherein a ribbon of the material will remain in position when placed on dried cement without substantial flowage. The viscosity of the composition may be varied upwardly, to a considerable extent, but in most instances I find it of no particular advantage to increase the viscosity beyond the point where a ribbon of the composition applied to a sole will retain its shape."

All this shows that Wedger's term "high viscosity nitrocellulose" as used in the spe-

cifications could be from about one hundred seconds or lower, and one would have to experiment to find how much lower, and ranged from that upward to a useful upper limit of about 1200 seconds, or 1000 to 1500 centipoises, though it might be still higher. Thus the term "high viscosity nitrocellulose" as used in the patent is about as variable as a sliding scale. He approached limits only in terms of the desirable characteristic to be imparted ·to the softener—the ability to remain as placed on dried cement without substantial flowage—and left those who followed his teaching to use old ingredients in the same old way but in such proportions as they might find for themselves "under existing conditions" would give the desired result. Those who had been using nitrocellulose, of whatever viscosity characteristic it might have, to make such softeners by dissolving it in any known solvent were left with no determinable standard by which they could tell what was claimed by "high viscosity nitrocellulose" or a "high viscosity softener," and consequently without means for discovering from either of those terms as used in the claims what could be done without a license and what could not. General Electric Co. v. Wabash Appliance Corp., supra. Because of such failure to comply with statutory requirements, product claims Nos. 1, 2, and 21 and process claims 19 and 20 are all invalid.

Claim 6 omits the expressions already considered and reads: "A composition for cutting hardened nitrocellulose cement comprising a solvent for nitrocellulose boiling in the neighborhood of 30 to 80° C. and containing dissolved material including nitrocellulose of a viscosity of at least several hundred seconds, in amount such that the composition has a viscosity of above 500 centipoises." The language of this claim is so definite that it avoids the infirmities present in the others. The only place where uncertainty might exist is in the description of the nitrocellulose as that "of a viscosity of at least several hundred seconds" and even there it is definite enough. "Several" numerically means, as defined in Webster's New International Dictionary, "Consisting of a number more than two, but not very many." See Lunt v. Post Printing & Publishing Co., 48 Colo. 316, 110 P. 203, 20 L.R.A.,N.S., 60, 21 Ann. Cas. 492. Here it is used to express seconds in terms of hundreds and means that the nitrocellulose of claim 6 has a viscosity

characteristic of at least more hundreds of seconds than two. The lowest possible is three and so the claim definitely states what it covers in terms that disclose what can be made without infringement and what cannot. Consequently, it fulfills all statutory requirements and is valid.

The accused products the defendant manufactured and sold for use as softeners for the purposes and in the manner the patented composition is used are known as "Cataract No. 12" and "Cataract No. 50." Manufacture of the latter was discontinued before this suit was brought. The nitrocellulose content of neither, however, was obtained by dissolving nitrocellulose of at least three hundred seconds viscosity. That which goes into No. 12 has a viscosity of from 30 to 40 seconds and that used in making No. 50 had a viscosity of 250 seconds. Neither softener so made infringed.

The dismissal of the defendant's counterclaim, which has been treated in argument as though based entirely on the provisions of the Clayton Act, 38 Stat. 731, § 3, 15 U.S.C.A. § 14, was clearly right. It was fatally defective, as such, in that no tying contract or agreement of any kind was alleged. And no other ground for reversal has been presented.

Decree reversed.