**L. L. ANTLE & COMPANY, Inc.,**
**Appellant,**

v.

**Frank GENOVESE, d/b/a Sno-Spud Company, Appellee.**

**No. 15367.**

United States Court of Appeals
Eighth Circuit.

June 18, 1957.

George M. Hopkins, Atlanta, Ga. (Edward Taylor Newton, Atlanta, Ga., Estill E. Ezell and Kingsland, Rogers & Ezell, St. Louis, Mo., on the brief), for appellant.

Ralph W. Kalish, St. Louis, Mo., for appellee.

Before GARDNER, Chief Judge, WOODROUGH, Circuit Judge, and DONOVAN, District Judge.

WOODROUGH, Circuit Judge.

This appeal is taken to reverse a judgment in a suit for patent infringement by which the complaint of the plaintiff, assignee and owner of the patent involved, was dismissed and there was declaratory judgment for defendant declaring the patent sued on invalid. The opinion of the District Court accompanying its judgment sets forth the issues, facts, conclusions and reasons and was carefully prepared but has not been published. As appellant asserts error in respect to the matters contained in the opinion, we will include the essentials of it here. The court stated the case as follows:

"Plaintiff sues for infringement of process or method patent No. 2,628,905, applied for December 26, 1951, and granted February 17, 1953. The pleadings present as principal issues validity of the patent and infringement."

"Plaintiff sells 'Whitato.' This is a powdered substance packed in glass jars, for use in making solution adapted to prevent discoloration of potatoes between time of preparing and cooking. This product is sold by plaintiff for use in the process of method recited in the claims of the patent."

"Defendant compounds and sells 'Sno-Spud.' Sno-Spud is a powdered material for use in making a solution adapted for the same uses as plaintiff's product. The directions as to method of use on the container of defendant's product are substantially the same as those on the label of plaintiff's product. The two products are sold by plaintiff and defendant in competition in the same markets. Neither plaintiff nor defendant engage in the business of performing any of the procedural method prescribed for use of the product."

"The complaint charges contributory infringement—that defendant by offering its product with method or processing directions is intentionally and actively inducing others to infringe plaintiff's patent."

"The history of plaintiff's patent is revealed in part by the Patent Office file wrapper. The original application contained 20 claims. Claims 2 to 20 were rejected—

"Claims 2 to 20 are rejected as indefinite. 'Sliced organic materials' is held too broad in covering the potatoes, fruits and vegetables disclosed. Furthermore, 'metallic' bisulfites or carbonates are held too broad in covering the 'sodium or potassium' salts disclosed.

"Claims 1 to 11, and 13 to 18, are rejected as too broad in that the character and pH of the 'buffered solution of sodium bisulfite' must be recited in the claim.

"Claims 4 to 20 are additionally rejected upon the ground of aggregation. The product, per se, is held nothing more than a mixture of well-known chemicals, and as such is held unpatentable. Only in its application to fruits and vegetables would a possible patentable procedure be involved.

"Claims 1 to 4, 10, 11, and 15 to 18, are rejected as met in terms by each of the patents cited above.

"Plaintiff then switched, as suggested, to a procedure application. The method patent as granted uses the chemical product for which a patent was refused."

"Plaintiff specifically recommends his patent in preserving peeled potatoes, and so does defendant. The process or method recites peeling, slicing and, very soon thereafter, dipping the potatoes in a solution formed by dissolving a mixture of chemicals in water. This mixture comprises about 85% sodium bisulfite, 10% a salt of a weak acid such as sodium carbonate, and 5% a weak acid such as citric acid. When the salt of the weak acid and the weak acid are added to the sodium bisulfite, and the same dissolved in water, it is claimed a buffered solution is formed having a pH[1] of about 5.2 to 6.5. It is plaintiff's claim that below a pH of approximately 5.2, the sliced potatoes dipped in such a solution will taste of sulphur dioxide, will bleed water and will give a poor French-fried product. Above a pH of approximately 6.5 the sliced potatoes will taste of soda, have a slimy appearance, and feel and have poor color."

"Plaintiff declares the discovery in its patent to be as follows:

"The invention was based on the discovery that a buffered solution of sodium bisulfite having a pH range from 5.2 to 6.5 gave unexpectedly good results in retarding discoloration of potatoes sliced for French frying. Even if all the steps claimed in the process were old and well known as far as mere procedure is concerned, the process was patentable by reason of the use of the reagent (the buffered solution of sodium bisulfite having a pH within the range of 5.2 to 6.5) in an otherwise old process.

"If plaintiff's patent is valid it must traverse a very narrow field. The chemicals prescribed are, as the Patent Office said in rejecting the original application, 'well known' chemicals. The process steps are, as plaintiff concedes in its brief, 'old.' The patent zone, then, is use of 'well known' chemicals by an 'old' process. Can the 'old' method use of the 'well known' chemical, i. e. 'the buffered solution of sodium bisulfite having a pH

within the range of 5.2 to 6.5' survive the test of new and novel in order to be the subject to a legal patent?"

"The patent shows a range of pH for each claim. This must have been a prime consideration for granting of the patent. During the trial plaintiff focused much of its proof on pH range as the essence of the patented process. The analysis of the product of defendant by plaintiff was as to its pH in solution. It was found under some circumstances the pH was within the range 5.2 to 6.5. On this basis infringement is charged, regardless of what buffer agent, if any, was used by defendant."

"The only formula referred to in the specification of plaintiff's patent is:

|  | Per cent |
|---|---|
| Sodium bisulfite | 85 |
| Sodium carbonate | 10 |
| Citric acid | 5." |

We do not observe any objection made by appellant to the foregoing statement of the case by the court except that it is argued the court erroneously stated the grounds on which infringement was charged. As the question of infringement was not reached, the argument respecting it need not be discussed.

Having stated the case the court cited, discussed and ruled in respect to prior art as follows:

"The Dell Alvos patent of May 17, 1949, No. 2,470,424, for preserving vegetables, recites in the first claim:

"A Wash solution for vegetable products comprising water and the reaction products of an alkali metal carbonate, water, and sulphur dioxide, the solution having a pH between about 5.0 and 6.0.

"The solution in the Dell Alvos patent is prepared by using sodium carbonate and sulphur dioxide. It is acidic with a pH in the range of 5 to 6. There was testimony that the use of sodium bisulfite and sulphur dioxide is not distinguishable in the two patents."

---

[1]. pH is the chemistry term to indicate the degree of acidity or alkalinity in substance. Number 7 is neutral. Below 7 is acid; above is alkaline.

"The following is from a pamphlet of the Bureau of Agriculture and Industrial Chemistry, U. S. Department of Agriculture, August, 1949:

"In an early U. S. Department of Agriculture publication (1900), Wiley recommended exposure of peeled potatoes to the fumes of burning sulphur as a means of preventing discoloration during the process of dehydration. It is possible that sulfiting was recommended for dried potatoes even before that time."

"As a guide to such experiments, the following treatments are suggested without implication of any recommendation. In general, these treatments have preserved peeled potatoes for about a week in cold storage.

"Treatment 1: A thirty-second dip in a 1.7% solution of sodium bisulfite.

"Treatment 2: A thirty-second dip in a solution of 0.5% sodium bisulfite and 0.5% citric acid. (Here only the sodium carbonate of 10% is missing and with the addition of the 10% we would have a duplicate of the mixture of plaintiff's patent.)

"Longer dipping time or stronger solutions strengthen the preservative action. However, too strong treatments may adversely affect the flavor of the product. If acid strength is too great, the product tends to leak in storage."

"Although treatment in sulfite solutions appears to be an adequate method of preservation for peeled and cut potatoes, legal restrictions in some areas prevent its use. In some instances a waiver may be obtained on the basis of the small amount of sulphur dioxide present as compared to the sulfite content of other common food commodities (such as dried cut fruits, golden bleached raisins, and white wines.)."

"Plaintiff's patent and the Dell Alvos patent have substantially the same chemical character and substantially the same pH. They are both applied by the 'old' process of dipping."

"In the May, 1944, issue of Food Industries, defendant's Exhibit M, page 46, is an article, 'Sulphite Retards Deterioration of Dehydrated Cabbage Shreds', containing the following:

"A final variable is the composition of the solution itself. Practical tests indicate that a solution having a pH of about 6.7 offers relatively few difficulties. At lower pH values, the solution becomes undesirably corrosive. The desired solution can be obtained in several ways. One of the simplest is to mix equal weights of sodium sulphite ($Na_2SO_3$) and sodium metabisulphite ($Na_2S_2O_5$).

"So while plaintiff may declare 'The invention was based on the discovery that a buffered solution of sodium bisulfite having a pH range of from 5.2 to 6.5 gave unexpectedly good results in retarding discoloration of potatoes sliced for French-frying', the prior art and literature forces a presumption that all that was contributed to the art was possibly some improvement in the use or method of known chemicals, but nothing new or novel."

"The record convinces us that all the inventors did was to exercise their knowledge of chemistry within the field of the art as known and by application of chemistry mechanics raise the pH of sodium bisulfite to the point desired by adding sodium carbonate. Any other alkaline would have operated similarly. The Dell Alvos patent reveals plaintiff's claim of discovery, only in different terms—

"In using the acid solution, it is diluted with water in about the proportion of one-half pint of acid solution to three gallons of water to produce a wash solution. This proportion varies somewhat with the age of the acid solution and variation in acidity due to manufacturing conditions, and the above stated proportion of 1 part of acid solution to 48 parts of water will not always produce the wash solution of proper acidity. I find, therefore, that it is best to add to the water to be used for washing enough acid solution to produce a pH of 5 to 6 in the resulting wash solution, which of course, contains some dissolved $SO_2$ and $CO_2$ and various sulphur compounds. To

obtain the best results, the acid solution is produced and bottled under pressure of 5 pounds per square inch or less and is retained under pressure until used to produce the wash solution.

"Claim 7 of the patent is typical. It recites:

"A process for preventing discoloration of freshly cut particles of fruits and vegetables comprising intimately contacting said particles with a solution containing an anti-oxidant, said anti-oxidant comprising approximately 85%, a sulphur dioxide agent. * * *

"The only formula set forth in the patent contains 'Sodium bisulfite 85%.' There was testimony that it is well understood in the food-chemical world that sodium carbonate is an alkaline compound having a pH above 7 and sodium bisulfite in solution has a pH on the acid side, or below 7. Whether sodium carbonate or some other alkaline material is used to raise the pH, the experts agree it is the sulphur dioxide which supplies the agency of preventing discoloration in the food particles. And that is the end result sought by the process patent of plaintiff and the accused compound and process."

"Defendant's expert testified that a chemist could compound the solution revealed by the prior art Dell Alvos patent and then by the 'old' process of the plaintiff's patent achieve the same results. If this is true then the Dell Alvos solution contains substantially the same necessary ingredients, can operate substantially on the same principles, and achieve substantially the same results as plaintiff's patent."

"We feel compelled to recognize that the spark of genius, the discovery of the new and novel in the process or method of what will result when sliced potatoes are subjected to contact with a solution containing certain basic chemicals, as defined in plaintiff's patent, has been brought to bear, performed the pioneer work and discovered the answer at least as early as the Dell Alvos patent, if in fact not earlier."

"There is no evidence in the record that the Patent Office considered the Dell Alvos patent. The inventors must be presumed to have had knowledge of it."

"The year 1944 seems to have been a period of considerable experimentation in the field in issue. We take the following from 'The Fruit Products Journal and American Food Manufacturers' for that year. The article is headed 'The Use of Sulfite Solutions in Potato Dehydration.'

"Laboratory experiments on dipping diced blanched potato in solutions of sodium bisulfite, sodium bisulfite brought to a pH of 7.5 with sodium carbonate, and sodium sulfite, all 0.07% in $SO_2$ showed that the latter two solutions do not control the darkening as well as the bisulfite under rigorous drying conditions. With other products like cabbage, the bleaching action of the acid sulfite is said to be detrimental, but this bleaching action is beneficial in the case of potatoes.

"We find that a person possessed of the reasonable and common knowledge and skill in the art in question, prior to application for plaintiff's patent, could practice plaintiff's purported invention by resort to the prior art at his command, and without reference to plaintiff's alleged patent. Novelty does not exist in plaintiff's patent."

Appellant contends here, as it did in the trial court, that the literature and patents prior to application for the Antle and Bohn patent on December 26, 1951, did not anticipate that patent.

█ It is first argued that the court erred in receiving in evidence the publications and prior patents assembled in one binding and relied on by defendant for the reason that defendant did not make the foundation proof of the fact and times of publication. But we deem the point to be without merit because the parties stipulated in writing before trial that uncertified copies of reference publications should be accepted in evidence with the same force and effect as if they were original or certified copies

thereof subject to correction of error, if error appeared, and when defendant offered the publications in evidence, plaintiff consented to their being received by making no objection to any of them. Appellee asserts that appellant had at least six months notice before trial in the majority of the documents and at least 30 days notice of the remaining minority. There is no claim now that any of those relied on was not in truth published on the date it bears nor that any was falsely dated or unpublished.

The court discussed in its opinion and quoted from a pamphlet of the Bureau of Agriculture and Industrial Chemistry, U. S. Department of Agriculture, Exhibit M–36, to which it ascribed the date of August, 1949, and appellant has stressed the fact that a part of the matter the court quoted[2] was from a supplement to the publication dated June 1952.

■ But the article considered by the court related to the preservation of peeled, or peeled and sliced, potatoes in such a manner as to permit the same to be sold as a packaged item commercially, an enterprise to which plaintiff's patent was not related. Plaintiff did nothing more in the field of preparing potatoes for French fries than had been done for a long period of time and the cited publication as a whole including the supplement of June 1952, provided the court with a wider view of prior art in the field of the patent in suit. Particularly the article cannot be read without perceiving that solutions of chemicals for dipping potatoes, fruits and other vegetables into between use during short periods in advance of cooking them had long been common, as found by the patent office on plaintiff's application. The date of the supplement from which the court quoted does not detract from the propriety of the court's quotation or the soundness of the court's reasoning. We find no error in the trial court's use of the publication. The warning contained in the publication against solutions with a pH within the range specified in the patent in suit referred to the harmful effect of such solutions upon machinery, used in commercial production line process utilizing metal equipment, but the exhibit was manifestly pertinent in that it discloses a sulfur dioxide treatment solution for vegetables, for preventing deterioration thereof, which is adjusted as to pH by the reaction or neutralization of an acid and a base as in the Antle solution. The publication discloses the use of the same alkali as the patent in suit, namely sodium carbonate (soda ash). The disclosed practice of adjusting a sulphur dioxide solution to a pH of 6.7 by the addition of an alkali indicates that an adjustment to 6.5 or lower by such means would suggest itself to persons skilled in the art.

The prior art patent separately discussed by the court was the Dell Alvos patent, No. 2,470,424, applied for May 16, 1946 and granted May 17, 1947, covering a wash solution for preservations of fruits and vegetables prepared by using sodium carbonate and sulphur dioxide, which is acidic, having pH in the specified range of 5. to 6.

Appellant argues that the Dell Alvos patent does not teach how much water or carbon dioxide, $CO_2$ gas, to use or how strong to make the solution to use, nor what size or kind of vegetables to treat and therefore it does nothing to teach the Antle process. But the arguments do not persuade that appellant contributed discovery or invention over the Dell Alvos patent in any of the particulars presented. We find no error in the court's conclusion that "novelty does not exist in plaintiff's patent."

The court also found the patent in suit to be void for indefiniteness as follows:

"There is a further norm by which we conclude plaintiff's patent must be ruled invalid if there was no prior art destroying novelty. We think it is indefinite under Section 112 of Title 35 of

2. To-wit: That part beginning with the words—As a guide to such experiments—

(If the opinion is published the date of the supplement should be indicated.)

the United States Code. The purported patent does not describe or define the process so that others will be enabled to ascertain its limits.

"The inventor 'must inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not.' (B. B. Chemical Co. v. Cataract Chemical Co., 2 Cir., 1941, 122 F.2d 526.)

"The claims in the patent recite the inclusion in the solution of 'an edible buffer * * * a buffer agent', for the stated purpose of buffering the sodium bisulfite. Claim 4 is characteristic of terms used in the various patent claims:

"A process for preventing discoloration of freshly cut particles of fruits and vegetables comprising intimately contacting said particles with an aqueous solution of an acid sulfite of the group comprising sodium bisulfite and potassium bisulfite buffered with an edible buffer to a pH range of from 5.2 to 6.5, and thereafter drying said particles for subsequent storage.

"A buffer, as we understand the use of the term, is a substance which within a predetermined and defined pH range will resist change of pH upon the addition of acid or alkali. Under the claims the solution called for in the patent must contain an agent which is a buffer in itself with the result that the solution will be buffered so that it will not be subject to pH change."

"The only buffer described as an 'edible buffer' or 'buffer agent' in the patent is a combination of sodium carbonate and citric acid. Their use and percentage is followed by this recital:

"It is understood, however, that any suitable edible buffer may be substituted in the place of those mentioned above without departing from the scope of our invention and that the proportions listed do not constitute the only proportions of our mixture which are operable.

"Since the buffer is admittedly so vital to plaintiff's process patent, has plaintiff

sought to broaden the patent by the use of this language?"

"And there is a serious question on this record if sodium carbonate and citric acid in the percentage stated in the patent constitute a buffer. By one expert it was called 'window dressing'."

"Also, being a process patent, we are struck by this language:

"In use, the potatoes are peeled, sliced and immediately dipped in a buffered solution of sodium bisulfite for periods of time ranging from one to several minutes, depending on the strength of the solution, the thickness of the slice, and the character of the potato. We have found one-half an ounce of our mixture to one gallon of water to be the optimum solution for the average potatoes sliced for French-frying.

"This language strikes the court as vague, when it is the very heart of the patent itself that is being referred to, namely the method process. Certainly much room is left for trial and error and experimentation on (1) time, (2) strength of the solution, (3) character of potato, as well as physical manner of slicing."

▇ The appellant points out that "the question of indefiniteness is directed to a patent as a whole and involves the question of whether or not the inventors have informed the public in their patent of their invention in such terms as will enable the public to practice the invention," and it argues that "there is no evidence to show that a person skilled in the art could not follow the Antle patent and achieve the results described." But in this case where the patent is for the process in which an unpatentable and old mixture of chemicals is used, it was clearly of vital importance to specify the mixture with some certainty. Invention being claimed in the discovery that a buffered solution of sodium bisulfite having a pH range of from 5.2 to 6.5 gave unexpectedly good results and it appearing in the patent specification that sodium bisulfite normally has a pH of approximately 5.1, some certainty of

specification was required to keep the claims from covering the single chemical which does the real work of preventing discoloration. More especially, reasonable certainty was required to inform the public of the limits of the monopoly asserted. We find no error in the conclusion of the trial court that the patent is invalid both for want of novelty and for indefiniteness of disclosure.

Affirmed.